**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**and**

**Taloyre E. Butler, Plaintiff-Intervenor,**

**v.**

**FINANCIAL ASSURANCE, INC., et al., Defendants.**

**No. 83–1303–CV–W–O.**

United States District Court, W.D. Missouri, W.D.

Sept. 24, 1985.

688

Robert G. Johnson, St. Louis, Mo., for E.E.O.C.

Susan Goering, Benson & McKay, Kansas City, Mo., for plaintiff-intervenor Taloyre E. Butler.

Donald H. Loudon, Morris, Larson, King, Stamper & Bold, and John J. Yates, Gage & Tucker, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDERS

ROSS T. ROBERTS, District Judge.

Plaintiff (the Equal Employment Opportunity Commission) and plaintiff-intervenor (Taloyre E. Butler, hereinafter "Butler") claim that Butler was discharged from her employment as an executive secretary because of her pregnancy, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* Butler seeks "make whole" relief; the EEOC, at least in its complaint, seeks more general injunctive and affirmative action relief.

## I.

### IDENTIFICATION OF BUTLER'S EMPLOYER

Although an argument to the contrary can and has been made, the evidence convinces me that Butler was in fact employed by a series of limited partnership entities—defendants Avenue Partners Limited, 2nd Avenue Partners Limited and 3rd Avenue Partners Limited—rather than directly by defendant Financial Assurance, Inc. No matter how the interrelationship between those partnership entities and Financial Assurance might impact the alternative suggestion that all should be treated as a single employer entity for present purposes, *see Baker v. Stuart Broadcasting Co.,* 560 F.2d 389, 392 (8th Cir.1977), a preponderance of the evidence demonstrates that Butler was in fact hired as an employee of the first of those partnership entities, rendered the majority of her services to that and to the succeeding partnership entities, was ultimately paid by those entities, and in most respects was controlled in her work by the general partner of those entities.

This finding in turn creates a threshold question with regard to the court's subject matter jurisdiction under Title VII, since it is clear that none of the partnership entities—whether taken individually or collectively—ever employed, during any relevant time, more than four employees. The problem arises because Section 2000e(b), in its definition of "employer," limits Title VII's application to those who have

> *fifteen* or more employees for each working day in each of the twenty or more calendar weeks in the current or preceding year, and any agent of such a person (emphasis added).

*See Massey v. Emergency Assistance, Inc.,* 580 F.Supp. 937, 938 (W.D.Mo.1983), *aff'd.* 724 F.2d 690 (8th Cir.1984); *Bonomo v. National Duckpin Bowling Congress, Inc.,* 469 F.Supp. 467, 470 (D.Md.1979).

Plaintiffs seek to overcome the problem by an argument that the relationship between the partnership entities and defendant Financial Assurance (which is conceded to have had more than fifteen employees at all relevant times) was such that those various entities should be considered as one for purposes of Section 2000e(b). The analysis to be applied in that connection involves the four part test outlined in *Baker v. Stuart Broadcasting Co., supra,* requiring a review of the following factors: (1) the degree of interrelation between the operations of the entities in question; (2) the degree to which those entities shared common management; (3) the degree of centralized control of labor relations as between those entities; and (4), the degree of common ownership or financial control of the entities. As pointed out in *Baker,* all four factors must be considered; no one alone is controlling.

In applying that analysis here, I find as follows:

(1) *Interrelationship of Operations.* Externally, there was little or no relationship between the operation of the limited partnerships—which were engaged solely in oil and gas investment—and the operations of Financial Assurance, which was a life insurance company. Internally, however, there was a significant degree of interrelationship, particularly as concerns

Butler's job as executive secretary for Michael Merriman (the general partner of the partnership entities). The evidence demonstrates, in that connection, the occasional direct sharing of Butler's services with Financial Assurance (e.g., when Betty Caton, the executive secretary for the president of Financial Services, was absent for several weeks, Butler took over at least some of her duties); Butler's work, while acting as Michael Merriman's secretary, on Financial Assurance matters;[1] a sharing of Financial Assurance employee services with the partnership entities (e.g., at least occasional work by Betty Caton for the original partnership; employee solicitation and initial interviewing performed by Ken Meineka); the sharing of an IBM word processor and a telex machine; and the occasional transfer of employees (W.E. Rexroot and Nancy Stiles) between the partnerships and Financial Assurance. In addition, at least the original partnership (Avenue Partners Limited) utilized the Financial Assurance payroll and the Financial Assurance insurance programs. Finally, as may have become obvious from the above, the partnership entities shared office space—in a somewhat undifferentiated fashion—with Financial Assurance, utilized the the Financial Assurance switchboard, and used the same utilities as Financial Assurance, although Financial Assurance was paid rent, and reimbursed for utility useage, on a rather loose basis. After the year 1981, when Avenue Partners took over its own payroll and insurance functions, this internal working relationship became less pronounced but remained significant nonetheless.

(2) *Common Management.* Financial Assurance was in all practical respects managed at its highest level by Joe Jack Merriman, its president (and defendant Michael Merriman's father). Michael Merriman was one of the three directors of Financial Assurance—although not an officer, during the time of Butler's employment—whose actual position with Financial Assurance can perhaps best be described as that of an "heir apparent" who in fact had less than complete interest in the insurance business despite his father's efforts to cultivate that interest. Michael Merriman did, however, involve himself in some aspects of the Financial Assurance business, and did in fact perform certain work in that connection which went considerably beyond the work ordinarily expected of an "outside" director,[2] although he in no real sense "managed," at any level, the affairs of the company. At the same time, while Michael Merriman in fact managed the partnership entities, as the general partner of each, he and his father consulted frequently, and in depth, in connection with that business. It also bears noting that Joe Jack Merriman supplied both advice and personal contacts for the solicitation of some of the limited partnership investors, and was authorized to sign partnership checks.

(3) *Centralized Control of Labor Relations.* The evidence with respect to any "centralized" (i.e., single source) control of labor relations is somewhat limited. In a few instances Michael Merriman undertook to issue or recommend policy directives which covered Financial Assurance employees. He also participated, with his father, in interviewing several higher level Financial Assurance prospective employees, and occasionally did salary reviews on Financial Assurance employees. Further, Butler's hours of work were originally assigned by a Financial Assurance employee (Meineka); she (and presumably all other partnership employees) were required to sign in and sign out on the same sheet used by Financial Assurance employees; and until Avenue Partners took over its own payroll functions in 1982, her personnel file was

---

1. E.g., reviewing new insurance application cards, typing actuarial certificates, taking the minutes of a management meeting and assisting in a Financial Assurance mass mailing.

2. He was interested in the lapse of Financial Assurance policies, and undertook to review the status of those matters on a monthly basis. He also took an interest in policy applications, and was active in checking upon applications he considered questionable. He was also authorized to sign Financial Assurance checks and in fact, during the major period of Butler's employment, signed almost half of them.

maintained by a Financial Assurance employee. In general, however, the duties, pay and other work related matters of Avenue Partners' employees (including Butler) were established and controlled by Michael Merriman, without interference or direction from Financial Assurance personnel; while the counterpart work related matters of Financial Assurance employees were controlled by Financial Assurance officers and employees. Butler was in fact discharged by Michael Merriman.

(4) *Common Ownership or Financial Control.* Joe Jack Merriman held, at all relevant times, a 65% stock ownership in Financial Assurance. The remaining 35% of the Financial Assurance stock was divided as follows: 10% to each of Merriman's three sons, including Michael,[3] and 5% to Merriman's wife. Both Joe Jack Merriman and Michael Merriman were investors in Avenue Partners (along with 27 other persons); the former held the second largest investment interest at 7.4%, while the latter held a 3.3% interest. Neither Financial Assurance nor any of the Avenue Partners entities held any direct investment in the other.

\* \* \* \* \* \*

■ As noted, in applying the *Baker* test all four of the above factors must be considered together; no one alone is controlling. Here, although the question is difficult and the answer elusive, I conclude that the composite picture which emerges is such as to warrant treating Financial Assurance and the three Avenue Partner entities as a single employer entity for present purposes. The problem is admittedly unusual in that the situation which existed actually resulted, in considerable part, not from the business practices and considerations ordinarily encountered with this sort of question, but instead from the fact that Mr. Merriman simply attempted—as many fathers in his situation might do—to interest his son in the family insurance business and to help him in business otherwise. That cannot, however, serve to obscure the

fact that there was a significant degree of interrelationship of internal operations, a fairly significant degree of common management as a practical matter, at least an observable degree of centralized control of labor relations in some respects, and a significant (although certainly less than complete) degree of common ownership. I conclude, accordingly, that the requirements of 42 U.S.C. § 2000e(b) are met.

## II.

### LIABILITY

As mentioned, Butler was employed as an executive secretary for Michael Merriman. She commenced her employment on January 26, 1981. In the first part of March, 1982, she learned she was pregnant.

■ On April 23, 1982, according to Butler, she advised Michael Merriman of her pregnancy. He allegedly replied, "[w]e can't have you running around the office with your belly sticking out to here," and told her that she would have to leave. According to Merriman, on the other hand, Butler first mentioned her pregnancy to him on April 30, 1982, accompanying it with the remark that he was thereby prevented from firing her. The only undisputed fact is that Butler was indeed fired, as of May 7, 1982. By Merriman's account, that discharge had nothing to do with Butler's pregnancy, but was based instead upon the fact that (a) she could not keep books, (b) had too many personal telephone calls, and (c) was insubordinate and had a personality conflict with him.

The issue, in the final analysis, in large part becomes one of credibility as between Butler and Merriman, taking into account of course the other, collateral evidence which tends inferentially to support one side of that credibility issue or the other. Having given due weight to all that evidence, and in making the credibility determinations that I must, I conclude that Butler's pregnancy, while perhaps not the sole factor involved in Michael Merriman's deci-

---

**3.** One-half of Michael Merriman's stock in Financial Assurance (i.e., 5% of the issued stock in the company) was held in a trust of undisclosed nature.

sion to discharge her, was in fact a substantial motivating factor in that decision.[4] Liability under the Pregnancy Discrimination Act amendments to Title VII, 42 U.S.C. § 2000e(k), is thus established.

## III.

### RELIEF

■ Under 42 U.S.C. § 2000e–5(g), the court has a rather wide range of relief available in dealing with a Title VII violation. A finding of liability ordinarily creates a right to reinstatement and back pay. *Darnell v. City of Jasper*, 730 F.2d 653, 655 (5th Cir.1984) (reinstatement); *Costa v. Markey*, 706 F.2d 1, 6 (1st Cir.1982), *cert. den.*, 464 U.S. 1017, 104 S.Ct. 547, 78 L.Ed.2d 722 (1983) (back pay); and *cf. Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420 n. 12, 95 S.Ct. 2362, 2373 n. 12, 45 L.Ed.2d 280 (1975). In appropriate circumstances, so-called "front pay" or other monetary relief, necessary to alleviate the effects of the unlawful act or practice, may be awarded as an alternative to reinstatement. *See*, e.g., *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 956–57 (10th Cir.1980). Injunctive relief and affirmative action may also be ordered. *See* 42 U.S.C. § 2000e–5(g). The ultimate object, of course, is to prevent a repetition of the practice and, insofar as possible, to make whole a person who has suffered injury on account of unlawful employment discrimination. *Albemarle Paper Co. v. Moody*, *supra*, 422 U.S. at 418–21, 95 S.Ct. at 2372–73.

■ Although the complaint in the present case seeks reinstatement, plaintiffs now urge that it not be ordered. My own finding is that reinstatement would be quite inappropriate, given the nature of the relationship which must exist between an executive secretary and the executive, and given the high degree of hostility which in fact exists between Butler and the Merrimans. *See Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1115 (4th Cir.1981), *cert. denied* 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981); and *cf. Meyers v. I.T.T. Diversified Credit Corp.*, 527 F.Supp. 1064, 1060 (E.D.Mo.1981). In the circumstances present here, I do not believe that conclusion violates the Eighth Circuit's admonition that reinstatement should be denied "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1138–39 (8th Cir.1981).

With respect to backpay, plaintiffs have undertaken to calculate the difference between the amount of money Butler in fact earned between May 7, 1982 and November 30, 1984, and the amount she would have earned in defendants' employ during that same period if her salary increases and bonuses had continued to accrue as in the period of her employment. That differential is $50,598.11. Presumably, if carried forward to today's date on the same basis, the figure would be $59,831.65.[5] These calculations in turn give rise to three questions: (a) whether it is appropriate, under the proof in this case, to calculate back pay by projecting bonuses and annual salary increases; (b) whether the back pay award should be diminished by virtue of Butler's alleged failure to mitigate her damage by making appropriate efforts to seek other employment; and (c), whether amounts re-

---

4. Given the existence of direct evidence on the issue (Butler's testimony regarding Michael Merriman's statements to her), which I accept and credit, I do not believe it necessary to undertake a *McDonnell-Douglas* type analysis. In that connection, however, I do note that, on balance, I find the defendants' evidence concerning Michael Merriman's purported reasons for firing Butler to be less than persuasive.

5. I am uninformed, of course, as to amounts which Butler has *in fact* earned between the date of November 30, 1984 and the date of this opinion. Butler will accordingly be ordered to file, within fifteen (15) days of the date of this opinion, an affidavit which accurately reflects those earnings, so that after any response and further development of the record which may be necessary the appropriate adjustments can be made.

ceived by Butler as unemployment compensation should be deducted from any backpay award.

As to the first issue, it is clear as a general matter that a calculation of backpay should include, in addition to the base salary amount, sums for pay raises the employee could reasonably have expected to receive, together with amounts for sick leave, vacation pay and other fringe benefits. *Rasimas v. Michigan Department of Mental Health,* 714 F.2d 614, 626 (6th Cir. 1983), and cases cited. It is also clear that any ambiguity or doubt with respect to what the claimant would have received but for the discrimination should be resolved against the discriminating employer. *Id.* at 628. Here, during her approximate fifteen months of employment, Butler had received salary increases totaling $200, and two bonuses of $550 each. Although this is rather a sparse background from which to project future salary increases and bonuses, particularly since I lack any information as to defendants' general policies and practices in connection with such things, and while it would obviously be inappropriate to adopt a theory that her increases and bonuses would continue at the same rate *ad infinitum,* it does not seem unrealistic, given the nature of her position, to accept that they would have continued as she projects for at least the period covered by the award here. I conclude, accordingly, that her general method of calculation is appropriate in this respect.

The issue regarding a failure to mitigate is troublesome. Given Butler's earlier employment history and qualifications I am, frankly, somewhat uncomfortable with the fact that she did not secure favorable replacement employment prior to October of 1984—some 29 months after her discharge by defendants. It is required, however, only that the employee make a "reasonable effort" to find other suitable employment, *see* 42 U.S.C. § 2000e–5(g); *Edwards v. School Bd. of City of Norton, Va.,* 658 F.2d 951, 956 (4th Cir.1981); *United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 937 (10th Cir.1979); and once

the employee has produced evidence—as here—that she was unable to find comparable work, the employer has the burden of showing that she did not exert that "reasonable effort." *Edwards v. School Bd. of Norton, Va., supra; United States v. Lee Way Motor Freight, Inc., supra; Di Salvo v. Chamber of Commerce, Etc.,* 568 F.2d 593, 598 (8th Cir.1978). It is clear that Butler did in fact make efforts to find employment—she visited the State Job Service Office on a number of occasions, seeking job referrals, read and marked newspaper advertisements, contacted personnel agencies and placed her name with at least one, followed up leads obtained in the foregoing ways by contacting prospective employers to determine the nature and incidents of the job, and actually submitted her application (either directly or through the employment agency) to at least Hallmark Cards, IBM, TWA, Fruehauf, Crown Center Hotel, Panhandle Eastern, Interstate Brands, Blue Cross and Blue Shield, Farmland Industries, Armco Steel, Kansas City Life, H & R Block, Guys Foods and Kelly Services. It is likewise clear that she did not refuse any employment offers from these or any other sources. She actually did baby sitting work during part of the time in question. Given these findings, I am unable to conclude that defendants have carried their burden of establishing that Butler did not exert at least a "reasonable effort" to find replacement employment.

The third mentioned issue is even more troublesome. Whether there can or should be a deduction for unemployment compensation received during the period covered by the backpay award is a subject of controversy among the various Circuit Courts, and indeed among various panels within the same circuit. The latest rulings of the Second Circuit, *see,* e.g., *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 47 (2d Cir. 1980), Fifth Circuit, *see Merriweather v. Hercules, Inc.,* 631 F.2d 1161, 1168 (5th Cir.1981), *Marshall v. Goodyear Tire & Rubber Co.,* 554 F.2d 730, 736 (5th Cir. 1977), *but see Winn Dixie Stores v. N.L.*

*R.B.*, 413 F.2d 1008, 1009–10 (5th Cir.1969), and Seventh Circuit, *see Syvock v. Milwaukee Boiler Mfg. Co., Inc.*, 665 F.2d 149, 161–62 (7th Cir.1981) (age discrimination case), *Bowe v. Colgate-Palmolive Company*, 416 F.2d 711, 721 (7th Cir.1969), all hold that the trial court may properly make such a deduction; while the latest rulings of the Third Circuit, *see Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 81–85 (3d Cir. 1983), *but see Ostapowicz v. Johnson*, 541 F.2d 394, 401 (3d Cir.1976), *cert. den.*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977), Fourth Circuit, *see E.E.O.C. v. Ford Motor Co.*, 645 F.2d 183, 195–96 (4th Cir. 1981), *rev'd on other grounds*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), Sixth Circuit, *see Rasimas v. Michigan Dept. of Public Health*, 714 F.2d 614, 627 n. 13 (6th Cir.1983), *but see Satty v. Nashville Gas Company*, 522 F.2d 850, 855 (6th Cir.1975), Ninth Circuit, *see Kauffman v. Sidereal Corp.*, 695 F.2d 343, 346–47 (9th Cir.1982), *but see Naton v. Bank of California*, 649 F.2d 691, 699–700 (9th Cir.1981) (age discrimination case), and Eleventh Circuit, *see Brown v. A.J. Gerrard Mfg. Co.*, 715 F.2d 1549 1550–51 (11th Cir.1983) (en banc), hold that such deductions may not be made. The Eighth Circuit, apparently, has not yet addressed the question, although a Division of this Court has. *See EEOC v. Riss International Corp.*, 28 EPD ¶ 32,641 (W.D.Mo.1982) (Sachs, J.).

The appropriate analytical starting point is with the Supreme Court's statement in *Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 419, 95 S.Ct. at 2372, that the backpay provisions of Title VII were expressly modeled upon the backpay provisions of the National Labor Relations Act. That observation leads in turn to the Court's earlier decision in *National Labor Relations Board v. Gullett Gin Co.*, 340 U.S. 361, 364, 71 S.Ct. 337, 339, 95 L.Ed.

337 (1951), where it was held, *inter alia*, that the NLRB

> had the power to enter the order in this case refusing to deduct the unemployment compensation payments from back pay, and that in so doing the Board did not abuse its discretion.

*Id.* at 364, 71 S.Ct. at 339.

By analogy, one might well argue that a similar discretion—either to deduct or to refuse to deduct—is vested in the courts in connection with administering Title VII. Even if that is so, however (for the contrary argument *see Brown v. A.J. Gerrard Mfg. Co., supra* ), I do not believe it would be appropriate to exercise that discretion by way of making such a deduction *unless* the unemployment benefits received by the employee could, when coupled with an unreduced backpay award, truly be considered as amounting to a double recovery. Such a position, it would seem, is foreclosed by subsequent language in *Gullett,* holding specifically that a double recovery is not involved in the present kind of situation.[6] I accordingly believe that defendants' argument here must be rejected.

Butler also seeks prejudgment interest on her backpay award, calculating the amount thereof by way of the interest rate utilized by the Internal Revenue Service in regard to back taxes during the years in question (May 7, 1982—January, 1983, 20%; January, 1983—July 1, 1983, 16%; July 1, 1983—December 1, 1984, 11%). This method of computation is reasonable, and in fact reflects the practice followed by the National Labor Relations Board in making backpay computations. *See Florida Steel Corporation*, 231 NLRB No. 117 (1977). Prejudgment interest on the backpay award will accordingly be al-

---

**6.** Although I am presumably bound by it, one might well suggest that the Court's treatment of this point in *Gullett* was overly broad. *See* the discussion of the collateral source rule in *Naton v. Bank of California, supra.* Were I writing on a clean slate I would hold that a "double recovery"—i.e., a recovery which makes the claimant *more* than whole—in fact does exist in the

present sort of circumstance *unless* the unemployment benefits are subject to recoupment. In Missouri, it appears, they are not, *see Belle State Bank v. Industrial Commission Division of Empl. Sec.*, 547 S.W.2d 841, 849 (Mo.App.1977); or at least I can find no authority for the proposition that they are.

lowed, computed on the basis suggested; but Butler will be required to file, within fifteen (15) days of the date of this opinion, a current computation thereof.

Butler also seeks an award of "front pay." As noted, *see Fitzgerald v. Sirloin Stockade, supra,* that sort of monetary alternative to an order of reinstatement can sometimes be appropriate. In the present case, however, Butler sought that kind of relief only for a one year's period of time. Given the length of time it has taken the court to render its decision in this matter—a period of time which will be covered by the backpay award in any event, with projected pay increases and bonuses included—I believe that backpay award itself will make Butler "whole." I accordingly decline to order "front pay" relief.

Finally, at least in her pre- and post-trial briefs and in her proposed findings of fact and conclusions of law, Butler seeks relief in the form of a "clear record," by way of an order requiring that defendants "delete from [her] personnel file any mention that she was fired, and instead show that she resigned voluntarily," and further requiring that defendants inform any prospective employer "that she was a satisfactory employee who resigned voluntarily." Plaintiffs cite no authority for such an order; and even if I had that power I would refuse to exercise it. Title VII requires that I make Butler whole, not that I rewrite history. The court's written opinion in this case is the most that I can do for her in that respect.

Whether the EEOC still seeks the injunctive or other affirmative action prayed for in its complaint is unknown, there being no mention of those subjects in any of its pre- or post-trial filings. There is, however, no indication that defendants have indulged in any similar discrimination in the past, or that they are likely to do so in the future. To the contrary, this case appears to represent an isolated incident. I see nothing to be gained, in those circumstances, by ordering injunctive relief or by attempting to frame any other sort of affirmative action.

## IV.

### ORDERS

Based upon all of the foregoing, it is

ORDERED that Butler submit to the court, within fifteen (15) days of the date of this opinion, an affidavit which states the amount of her earnings between the date of November 30, 1984 and the date of this opinion; and in addition submit to the court a revised computation of prejudgment interest calculated as provided for herein; and it is further

ORDERED that upon the submission of such items to the court, defendants shall have five (5) days within which to advise the court whether they wish to contest any of the information contained in such submissions; and it is further

ORDERED that upon receipt of Butlers' said submissions and the lapse of said five (5) day response period, or upon the determination of any issues raised by said response, the court will enter a final judgment in accordance with the terms of this opinion.