Debbie BRISCOE, Plaintiff,

v.

FRED'S DOLLAR STORE,
INC., Defendant.

No. H-C-91-112.

United States District Court,
E.D. Arkansas, E.D.

June 9, 1993.

---

Alvin Leonard Simes, Simes & Simes, West Helena, AR, for plaintiff.

Bryon L. Freeland and Abraham W. Bogoslavsky, Mitchell, Williams, Selig, Gates & Woodyard, Little Rock, AR, for defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

The plaintiff, Debbie Briscoe, a black female, instituted this action against defendant, Fred's Dollar Store Inc., on November 15, 1991, after receiving Notice of Right to Sue from the Equal Opportunity Employment Commission on August 19, 1991. The Court's jurisdiction is invoked pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

Plaintiff contends that she was terminated from her employment with defendant on September 11, 1989, because of her race and seeks reinstatement, back pay, punitive damages and a decree prohibiting acts of "harassment and racial discrimination" in the work area.

After carefully considering the evidence produced during the course of a two day trial and argument of counsel, the Court finds that the plaintiff has established a **prima facie case,** by a preponderance of the evidence, that defendant, through the action of its store manager, Ms. Carol Way, a white female, (Ms. Way) purposely terminated

plaintiff because of plaintiff's race; that defendant failed to demonstrate that plaintiff's discharge was based on legitimate and non-discriminatory reasons. However, assuming that defendant has asserted legitimate and nondiscriminatory reasons for Ms. Way's action in terminating plaintiff, the Court further finds that the alleged reasons are pretextual and asserted to conceal the fact that plaintiff's discharge was based on race.

## RELEVANT FACTS

Plaintiff was hired on August 15, 1987, as a part time cashier by Ms. Way. Plaintiff is a high school graduate and has earned an associate degree in business management and administration from Draughon's Business College of Memphis, Tennessee. Plaintiff testified that she never received a job description setting forth her duties and responsibilities as head cashier, but was required also to perform menial tasks, i.e., tag merchandise, dust, clean working area, sweep the floors and wash shopping carts while white cashiers were not required to perform these menial tasks to the degree and extent assigned to plaintiff. Plaintiff testified that she never received a copy of employee's manual or handbook setting forth the policies of the defendant until the date of her discharge.

On October 23, 1987, plaintiff received her first performance appraisal. Plaintiff received five points, the highest rating or above average, for attendance and punctuality; she received three points, an acceptable level, for each of the following: housekeeping/safety practices and careful/accurate work habits. Plaintiff was advised, however, that she needed improvement in "being friendly and helpful to customers, work pace and staying busy and being accurate." Pursuant to this first evaluation, plaintiff received an overall performance rating of eleven points out of a maximum range of thirty.

On April 19, 1988, plaintiff received her second performance appraisal receiving an overall performance rating of twenty-six points out of a maximum range of thirty. Plaintiff was rated superior or above average in the following areas: "attendance/punctuality, housekeeping/safety practices; helpful, friendly with customer and careful and accurate work habits." Plaintiff received "acceptable-normal" or three points for each of the following: "efficient and speedy work pace" and "system and procedures knowledge." No improvement needs were noted. In addition, plaintiff received a wage increase of ten cents per hour resulting in an hourly wage rate of three dollars and fifty-five cents per hour.

On October 7, 1988, plaintiff received her third and, seemingly, the last performance appraisal. Plaintiff received a total of thirty points for overall performance, the maximum rating range. However, it was noted that Plaintiff needed to improve in the areas of "housekeeping/safety practices," "helpful, friendly with customer" and "efficient and speedy work pace." Plaintiff also received a wage increase of ten cents per hour resulting in hourly wage rate of three dollars and sixty-five cents per hour. The three performance appraisals were conducted by Ms. Way.

In August, 1989, Ms. Way offered plaintiff the position of Health and Beauty Aids Department Manager which plaintiff accepted. A few days later, Ms. Way asked plaintiff if plaintiff would like a vacation. Plaintiff accepted the offer and it was understood between the two that plaintiff would be given one week commencing September 1, 1989, and that plaintiff should report for work on Friday, September 8, 1989. Plaintiff along with her husband and minor children traveled by automobile to Cleveland, Ohio to visit relatives. On Thursday, September 7, 1989, while in route to Arkansas and approximately one hundred miles out of the Cleveland area, the vehicle that plaintiff and her husband were using developed mechanical problems. Plaintiff's husband decided, after considering the nature of the problem, to return to his brother's home in Cleveland and make the necessary repairs himself. Plaintiff testified:

"I went to [the] nearest phone and called my mother and at that point I thought he [her husband] could fix it right away, he tried and he worked on it and he could not repair it right then. So what I did after I found out that he could not fix it as soon as he could was call my mother and had her call in for me to Carol and notify her that I

was not going to be able to come back to work [until Monday, September 11]."

Plaintiff also stated that she did not call Ms. Way directly because the call would have been collect and that Ms. Way did not accept collect calls.

On Friday, September 8, 1989, plaintiff's mother called Ms. Way at approximately eleven o'clock a.m., and advised her of the problems encountered by plaintiff; and that plaintiff would be reporting for work on Monday, September 11, 1989.

After arriving home during the early hours on Sunday, September 10, plaintiff called Ms. Way's home and was advised by Ms. Way's husband that Ms. Way was "not in". Again, plaintiff called Ms. Way early Monday morning, September 11, before reporting for work and was advised by Ms. Way that "I [plaintiff] need to come into work."

On September 11, 1989, at approximately nine o'clock a.m., plaintiff reported for work and during a conference with Ms. Way, Ms. Way asked plaintiff what happened that caused plaintiff not to appear for work on September 8. Plaintiff explained the problems encountered, but Ms. Way was not persuaded that plaintiff was truthful about the matter and told plaintiff she was "lying" and terminated plaintiff. The reason, designated by Ms Way, for the action taken resulting in the discharge of plaintiff, and written on defendant's printed form provides:

"Failure to work scheduled hours [and] not calling in herself when she could come to work."

## PLAINTIFF'S CONTENTION

Plaintiff contends that Ms. Way terminated her because of plaintiff's race. In support of this position, plaintiff related the following matters and experiences:

1. When plaintiff was hired as a cashier, there were a total of seven employees working at defendant's McCrory, Woodruff County, Arkansas, store two of whom were black and the remaining five were white even though at least fifty per cent of the patrons of defendant's convenience store are black and the population ratio at McCrory is approximately sixty per cent black.[1]

2. During plaintiff's tenure, Ms. Way expressed the belief to plaintiff that all blacks steal and that plaintiff was advised to observe black patrons closely, especially those blacks who enter the store with large purses or bags, but never requested plaintiff to observe white patrons.

3. That there existed, throughout the store, the belief and awareness that a white employee, Stacy Adkinson, was stealing assets of the defendant, but Ms. Way took no steps to counsel or terminate him until an assistant manager approached Ms. Way about the matter.

4. Plaintiff was advised by Ms. Way that plaintiff could not enter the store in excess of five minutes before the scheduled time for assuming her duties; this condition, however, was not applied to white employees.

5. That whenever plaintiff drove an automobile to work other than that owned by her immediate family, Ms. Way questioned plaintiff about her financial ability to afford a different vehicle.

6. Plaintiff was directed by Ms. Way not to bring her purse to the work area when plaintiff was serving as cashier; and that if the purse is placed in the area, plaintiff could not remove it. Upon discussing the matter with the district manager, plaintiff was advised by the district manager that he was unaware of any such

---

1. Plaintiff did not offer any statistical evidence demonstrating the actual number of blacks residing in McCrory, Woodruff County, Arkansas, but contends that it is generally known that blacks out number whites in the Delta Area of Southeast Arkansas which McCrory, Woodruff County, Arkansas is a part; and that the Court should take judicial notice of this generally known view.

It is readily apparent that plaintiff seeks to demonstrate that there is a gross disparity in the black population at McCrory and the number of blacks employed by defendant during the period involved here as well as currently. Since the general population includes children and persons of retirement age and there is an absence of any evidence demonstrating whether all of the positions at the facility are unskilled or otherwise, the Court would have to speculate on the probative value of plaintiff's proffer. The Court simply notes plaintiff's observation but will not employ it in resolving the issues in this action.

rule or policy. White employees whom plaintiff communicated with about the condition imposed were also unaware of such a policy.

7. Mary Turner, the other black female employee, serving as clerk and part-time cashier, advised plaintiff that Ms. Way did not like plaintiff and had said that she, Ms. Way, would not promote plaintiff to the position that Mary Turner was resigning and moving out of state. The position, while not designated as assistant manager, while Mary Turner occupied the position, was filled by a white female who had a tenth grade education and had earned a GED certificate and had less seniority and experience than plaintiff. Plaintiff would have been eligible to fill the position had she remained an employee. The position was designated assistant manager and the white employee, Norma Morris, was afforded on-the-job training in order to qualify for the position. Since plaintiff's discharge, no blacks have been employed by defendant at its McCrory facility.

8. White part-time employees were allowed to have their relatives call in their behalf to advise Ms. Way of conflicts resulting in tardiness or absences. Plaintiff, on occasions, was called by Ms. Way to fill in for these employees without any advance notice. As an illustration, plaintiff cited an instance where Ms. Way had granted plaintiff a week off to make a trip to New Orleans, Louisiana. Plaintiff made extensive preparations, including reserving accommodations at a motel, for the trip when, without any advance notice, Ms. Way directed plaintiff to cancel the trip and fill in a weekend schedule for a white employee, Lorie Gibson, who had been notified to take an "A.C.T. test" advising plaintiff that "taking a test is more important than taking a trip."

## DEFENDANT'S CONTENTION

Defendant denies that race was a factor in the discharge of plaintiff on September 11, 1989. Ms. Way, the store manager, testified that plaintiff as a part-time employee was not entitled to vacation pay, but consented that plaintiff could take the week of Labor Day off, and electing either the weekend before or after Labor Day, but could not be off both weekends. It was mutually understood that plaintiff would take the weekend prior to Labor Day and the following week with plaintiff reporting for work on Friday, September 8, 1989. However, plaintiff did not show up for work on Friday, but plaintiff's mother called at approximately eleven o'clock a.m. Friday and advised Ms. Way that plaintiff had called from Cleveland and requested her to advise Ms. Way that plaintiff would not be reporting to work until Monday, September 11, 1989. Ms. Way further testified that another employee informed her that plaintiff's sister had told her, the other employee, that plaintiff had planned to be on vacation until the weekend after Labor Day.[2]

When plaintiff arrived for work on Monday, September 11, 1989, Ms. Way had a conference with plaintiff and requested plaintiff to advise her of the circumstances resulting in plaintiff's failure to appear for work on Friday, September 8. After hearing plaintiff relate the alleged automotive problems encountered enroute to Arkansas and disbelieving plaintiff, Ms. Way terminated the plaintiff.

Ms. Way further testified that she had received complaints from patrons of the store to the effect plaintiff was not friendly and had failed to return change to a customer; and that plaintiff had refused, on an occasion, when serving as cashier, to place bicycles on display on the outside of the store when requested by an assistant manager; and that these matters were also taken into consideration in discharging plaintiff.

## DISCUSSION

▪▪▪ First, the Court would note that credibility is an important and vital factor in

---

**2.** Counsel for plaintiff objected to the statement allegedly made by plaintiff's sister to the employee who discussed the matter with Ms. Way on the grounds of hearsay. Defense counsel advised the Court that the statement was not being offered to prove the truth of the matter asserted, but for state of mind purposes given the additional fact that Ms. Way immediately approached plaintiff about that statement before plaintiff left on her vacation.

Plaintiff testified that she and her family arrived home Sunday morning, September 10, 1989, at approximately one o'clock a.m.

the resolution of the issues in this proceeding which, in essence, is a disparate treatment case. After carefully considering the evidence, argument of counsel and crediting the testimony offered by plaintiff, the Court finds that plaintiff has established, by a preponderance of the evidence, a **prima facie** case that defendant, through its store manager, Ms. Way, purposely terminated plaintiff on September 11, 1989, as an employee, because of race. The Court is further persuaded that defendant has failed to demonstrate legitimate and nondiscriminatory reasons for the employment decision resulting in the discharge of plaintiff. However, assuming that defendant has shown legitimate and nondiscriminatory reasons for its action, the Court is of the view that plaintiff has demonstrated that such reasons are pretextual and designed to cover the factor of race. See: *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

In setting forth the reason for discharging the plaintiff, Ms. Way, merely stated for the record: "Failure to work scheduled hours [and] not calling in herself when she could come to work." No other reasons were noted. Significantly, plaintiff's failure to report for work as scheduled because of an emergency, an oil leak developed in the vehicle being used by plaintiff and her family while enroute from Cleveland, Ohio to Arkansas, was the first time that plaintiff failed to appear for work as scheduled during the two years that plaintiff worked for defendant. As a matter of fact, Ms. Way personally evaluated plaintiff's performance on three separate occasions, during the two year tenure, and each time gave plaintiff the highest rating allowed for "attendance/punctuality" as well as granting plaintiff an hourly wage increase on each occasion.

Defendant's attendance policy relative to hourly personnel sets forth procedures for resolving attendance issues which Ms. Way did not apply in plaintiff's case. Relative to

3. "[N]o report" is defined as "an absence with no notification to the Manager by the employee is considered a 'no report.' After one day of no report, an employee can be considered to have voluntarily resigned."

an absence that is unavoidable, the policy provides in relevant part:

> Situations beyond an employee's control may arise which prevent him/her from being at work. The employee is to notify the Manager as soon as he/she knows of the conflict. Included in this category are:

> .     .     .     .     .

> Other last minute unavoidable conflicts deemed to be legitimate by management.

> When any of the above situations occur, the Manager should discuss the situation with the employee upon his/her return, getting all pertinent details. Depending on the nature of the circumstances and the time lapse between the employee's notification to management and his/her return to work, the Manager may excuse all or a portion of the absence. An employee may be asked to furnish proof of the need to be absent.

Ms. Way conceded that she simply asked plaintiff, when plaintiff reported for work on September 11, what prevented plaintiff from reporting for work on September 8, but did not ask to see evidence of the long distance call made from Cleveland, Ohio to plaintiff's mother or speak with plaintiff's husband and mother in an effort to clarify or remove the doubt that she possessed of plaintiff's explanation for missing work for two days.

Defendant's attendance policy also provides for the following procedure "when unexcused absences and 'no reports' occur within any six month period:[3]

1st Occurrence—Employee counseled by Manager.

2nd Occurrence—Employee receives written warning.

3rd Occurrence—Employee receives written warning and notice of 90 day attendance probation.

4th Occurrence—If within the 90 day probationary period, employee is terminated.

It is unquestioned that on the scheduled date that plaintiff was to report for work, plaintiff's mother called the manager and advised her of the problems that plaintiff had encountered in returning to Arkansas; and that plaintiff would be reporting for work on Monday, September 11.

If after the 90 day probationary period ends but within the six-month period, employee is placed on another 90 day attendance probation. Another occurrence during this time results in termination.

Ms. Way stated that while she did not designate, as additional reasons for terminating plaintiff, she did take into consideration complaints that had been made by patrons regarding plaintiff's unfriendly attitude and the refusal to follow the order of an assistant manager directing plaintiff to place bicycles on the outside of the store. Given the fact that Ms. Way conferenced with plaintiff about these complaints, but did not impose any sanctions or advise plaintiff written notations were being place in plaintiff's personnel file, as required under the policies of defendant, the Court is convinced that the assertion of the alleged complaints as additional reasons is an attempt to cover the factor of race as the basis for the discharge of plaintiff. Significantly, Ms. Way was advised that a patron had registered a complaint against a white female employee, Lisa Best, for selling the patron's minor child cigarettes. While Ms. Way conferenced with Lisa Best, Ms. Way took no steps whatsoever to file any written memorandum in Best's personnel file or reprimand her.

In addition, white employees were granted permission to have their relatives notify management whenever a conflict developed necessitating being absent from work. Plaintiff testified that on several occasions management called plaintiff without any prior warning to fill in for white employees who were absent.

At the time plaintiff was hired as a cashier, plaintiff was not given an employee hand book containing the policies and regulations of defendant's, nor a job description of her duties, but was simply advised that she was a cashier and "I had to tag merchandise, run the front of the store, checking out customers, doing lay aways, refunds, and helping customers."

Ms. Way was suspicious of the honesty and integrity of black patrons and, in discussing the matter with plaintiff, Ms. Way never questioned the honesty of white patrons or white employees. Ms. Way advised plaintiff not to report for work in excess of five minutes of the scheduled time for reporting; and further admonished plaintiff not to place plaintiff's purse in the work area where plaintiff served as head cashier. Upon consulting the district manager about the restrictions being imposed by Ms. Way, plaintiff was advised by the district manager that he was unaware of any such rules or regulations.

After plaintiff's discharge, a white female, Norma Morris, was elevated to fill a vacant position which would have been filled by plaintiff providing plaintiff had not been terminated. The position was immediately reclassified from "clerk/cashier" to assistant manager. Morris had completed only ten years of schooling and earned a GED. Morris was also afforded on-the-job training in order to meet the qualifications for the position. On the other hand, plaintiff was a high school graduate and had earned a degree in business management and administration and possessed more seniority than Morris. In addition, plaintiff's educational achievements exceed Ms. Way's accomplishments. Ms. Way has only a high school diploma.

This Court is persuaded that the reasons designated by Ms. Way for terminating the employment of plaintiff are pretextual and that the termination was racially motivated. The Court is of the view that this course of action resulting in the discharge of plaintiff would not have been taken had plaintiff been a white employee. In other words, this Court is persuaded that but for the factor of race, plaintiff would not have been discharged.

## RELIEF AND DAMAGES

Plaintiff has requested reinstatement, punitive and compensatory damages and an injunction enjoining defendant from any further "harassment and racial discrimination."

Section 706(g) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5(g) provides in relevant part:

If the court finds that the respondent has intentionally engaged in an unlawful employment practice charged in the complaint, the court may enjoin the respondent

from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement ... or any other equitable relief as as the Court deems appropriate.... Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person ... discriminated against shall operate to reduce the back pay otherwise allowable.

### Injunctive Relief

■ Plaintiff having prevailed in this action and the evidence reflecting that defendant has engaged in a consistent practice of discriminating against its black employees in implementing defendant's policies and regulations, defendant, Fred's Dollar Store, Inc., and its agents are hereby permanently enjoined from implementing its policies and regulations governing its relationship with its employees in a racially discriminatory manner.

### Punitive and Compensatory Damages

■ The general view holds that punitive and compensatory damages are not recoverable in a Title VII action. See: *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957; *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir.1982). The basis for this concept has been the view that punitive and compensatory damages are not equitable remedies and, consequently, are not encompassed in the term "any other equitable relief" set forth in § 706(g). Accordingly, this requested relief is denied by the Court.

### Back Pay

■ The Court is convinced that plaintiff has sustained an economic loss as a direct consequence of the discriminatory employment decision resulting in plaintiff's discharge. Consistent with one of the Congressional purposes of Title VII, the Court will award back pay in effort to make plaintiff "whole."

When plaintiff was discharged on September 11, 1989, plaintiff was earning three dollars and sixty-five cents per hour and was accumulating thirty-four hours weekly. The evidence reflects that plaintiff acquired employment on April 23, 1991. Thus, plaintiff was unemployed for a period of eighty weeks resulting in the loss of $9,928.00 in wages which the Court is awarding plaintiff including pre-judgment interest at the rate of six percent. In addition, defendant is directed to pay the social security taxes as well as unemployment premiums that defendant would have been required to pay had plaintiff been a part of defendant's work force. During this period of unemployment, plaintiff received unemployment benefits in the sum of $1,144.00. The Court, however, will not deduct the unemployment benefits, which are collateral benefits in essence, from the award of back pay. See: *Beshears v. Asbill,* 930 F.2d 1348 (8th Cir.1991); *E.E.O.C. v. Ford Motor Co.,* 645 F.2d 183, 195–196 (4th Cir., 1981); *E.E.O.C. v. Financial Assur., Inc.,* 624 F.Supp. 686 (WD Mo., 1985).

The Court is further persuaded that defendant has failed to demonstrate that the back pay award should be reduced or mitigated due to plaintiff's failure to use reasonable efforts to minimize her damages.

### Reinstatement

■ In her complaint, plaintiff requested reinstatement to her former position with defendant. Although the evidence shows that plaintiff is currently employed as manager of Bill's Dollar Store where she was initially employed on April 23, 1991, as assistant manager, she never formally withdrew her reinstatement prayer and so the Court will address that issue.

After carefully considering the evidence received during the course of the trial of this action, the Court is not convinced that it would be in the best interest of either the plaintiff or the defendant to order defendant to reinstate plaintiff as an employee. It is quite apparent that there exists a degree of animosity and hostility between plaintiff and Ms. Way, due to the adverse conditions that plaintiff was required to work under during the two years that plaintiff worked for defendant, and it is unlikely that there would be that peace and harmony that are essential to a good and positive relationship. Therefore,

the Court denies plaintiff's request for reinstatement.

■ Generally, the alternative to reinstatement is an award of front pay for an appropriate period to make the plaintiff whole and relieve her of the effects of discrimination. See: *King v. Staley,* 849 F.2d 1143 (8th Cir., 1988); *Goss v. Exxon Office Systems Co.,* 747 F.2d 885 (3rd Cir., 1984). However, the record is deficient regarding the plaintiff's past and current earnings at Bill's and the number of hours she works per week. The Court would have to engage in speculation and conjecture to fashion any form of front pay award. Thus, front pay will not be awarded.

In conclusion, plaintiff shall be entitled to recover her cost expended in his proceeding; and counsel for plaintiff shall file his request for attorney's fees within the time frame provided for under the local rules.

IT IS ORDERED.

### JUDGMENT

In accordance with the memorandum opinion and order filed this date, judgment is hereby entered in favor of plaintiff and against defendant. Defendant and its agents are permanently enjoined from implementing its policies and regulations governing its relationship with its employees in a racially discriminatory manner. Plaintiff is awarded $9,928.00 in back wages with pre-judgment interest to accrue at the rate of six percent and post-judgment interest to accrue at the statutory rate. In addition, defendant is directed to pay the social security taxes as well as unemployment premiums that defendant would have been required to pay had plaintiff been a part of defendant's work force.

DATED this 9th day of June, 1993.