**Michelle Ann STOCKETT, Plaintiff,**

v.

**Frank TOLIN, et al., Defendants.**

**No. 88–1550–CIV.**

United States District Court,
S.D. Florida.

April 24, 1992.

ORDER

MARCUS, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action was brought by the Plaintiff, Michelle Ann Stockett, against her former employers, Frank Tolin ("Tolin") and three closely-held Florida corporations, Limelite Studios, Inc. ("Limelite Studios"), Directors Production Company ("DPC") and Limelite Video, Inc. ("Limelite Video"), which Plaintiff claims Tolin controls. Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, for hostile work environment, *quid pro quo* sexual harassment, and constructive discharge, a wage-and-hour claim under the Federal Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.*, and several pendent common law torts including battery, invasion of privacy, intentional infliction of emotional distress, and false imprisonment. Plaintiff's claim of misrepresentation was voluntarily dismissed. Stockett seeks declaratory and injunctive relief and compensatory and punitive damages. The parties agreed to the trial of the common-law tort actions before the Court without a jury, and therefore the Plaintiff's entire case was tried before the Court. This Court has reviewed at length the voluminous testimony and documentary evidence received at trial, and has taken argument from counsel, and pursuant to Fed. R.Civ.P. 52(a) makes the following Findings of Fact and Conclusions of Law:

### I. FINDINGS OF FACT

1. This is an action for relief under Title VII of the Civil Rights Act of 1964 for sexual harassment and constructive discharge, for relief under the Fair Labor Standards Act for violation of wage and hour laws, and for damages for pendent state law tort claims.

2. On February 5, 1988, Plaintiff, Michelle Ann Stockett, (herein "Stockett"), filed a Charge of Discrimination with the Dade County Fair Housing and Employment Opportunity Commission. The EEOC

Karen Coolman Amlong, Ft. Lauderdale, Fla., for plaintiff.

Gregory John Willis, Miami, Fla., for defendants.

issued Stockett a Notice of Right to Sue, dated May 25, 1988.

3. Plaintiff is a 29 year-old woman, who was employed by the Defendants from December 30, 1985, through on or about April 22, 1987. On December 30, 1985, Plaintiff was accepted for an internship program sponsored by Florida State University, where students are given on-the-job training in the film industry. She worked for a short time as a receptionist before beginning her internship on January 6, 1986. The internship ran through March 28, 1986. After the conclusion of the internship program, Plaintiff remained employed by Defendant corporations until she resigned late in April 1987.

4. Each of the corporate defendants, Limelite Studios, Limelite Video, and DPC is or was a closely-held Florida corporation with its principal place of business at 7355 N.W. 41st Street, Miami, Florida. Limelite Studios, which rents out stages, was incorporated in late 1982. Limelite Video, which is involved in the business of post-production work and off-line editing including graphic special effects such as clay animation, was incorporated on October 8, 1985. Both are active corporations. DPC, which was incorporated January 27, 1986 and produced video and film pieces, stopped doing business in the summer of 1986 and was involuntarily dissolved in October 1989.

5. Defendant Frank Tolin is a 71–year old man, who at all times relevant to this lawsuit owned most of the stock in the Defendant corporations and dominated the organization and operation of the Defendant companies. At all material times, he owned approximately 95% of the 7,125 issued shares of Video stock; Ron Fenster owned the remaining 5% of Video stock. Tolin owned all of the issued shares of stock in Limelite Studios. He owned 50% of the stock of DPC. The remaining 50% of DPC's stock was owned by Ron Fenster. Tolin and Fenster were directors of Video. Initially, Ron Fenster was President of the corporation, Tolin was Vice President and Secretary and Wanda Rayle was Treasurer. Tolin and Fenster continued to hold corporate office throughout 1986 and 1987. At all material times, Tolin was a director of Limelite Studios and was its president. In 1985, other corporate officers included Tolin's wife, Beatrice, and daughter, Lynn. In 1986 and 1987, Studio's other corporate officers were Wanda Rayle and Tolin's son, Henry S. Tolin. Tolin and Fenster were directors of DPC and Tolin was an officer when the corporation was active. Fenster was President of DPC until February 1986 when he resigned and was replaced by Carol Ennace. Tolin was the financial and moving force behind the entire operation. The credible evidence establishes that Rayle was Tolin's second-in-command.

6. Although Limelite Studios, Limelite Video and DPC were separate corporations, they were, as Fenster and Tolin referred to them, more like "departments" within one large company that also included Limelite Mobile, Inc., Limelite Equipment Rental, Inc., Limelite Financial Management Services, Inc. and Limelite Motion Pictures, Inc., all of which were engaged in businesses relating in some way to the production industry. DPC was, according to Wanda Rayle, operated "as one of our businesses." Tolin's headquarters were at the studios and he ran the Limelite companies, as well as Tolin Construction Company and his vast real estate holdings, from there.

7. Employees of the Tolin enterprises sometimes were paid by one company, sometimes by another. Supervisory personnel such as Wanda Rayle and Ron Fenster exercised authority over employees of all of the Tolin companies. One receptionist paid by Limelite Studios took in visitors for all the companies. As evidenced by Tolin's chart of accounts and the companies' "direct payment check forms," income and monies from the companies were "pooled" and then disbursed as needed to the various corporations as intra-company loans or loans from Tolin. There was a pool of money that paid everybody on payroll, regardless of the company for which they nominally worked. Bank deposits, disbursements, payroll and the preparation of trial balances for all the companies were performed by employees of Limelite Studios until those functions were taken over by Limelite Financial Services, Inc. in August

1986. Employees of Studio, Video, as well as other Tolin companies, were carried on the same group health insurance policy. At the end of 1986, a renewal notice for the policy showed 48 employees all listed as the employees of "Limelite Studios," although on a "master employees list" they were shown as employees of the various companies. Liability and excess liability insurance policies included one or more of the Defendants as the "named insured" under the same policy. The companies shared one copy machine, a common phone system and a time clock. They had common personnel policies. Even Defendant's response to the EEOC's Notice and Charge of Discrimination is on letterhead proclaiming:

Limelite
The Country's Largest
and
Most Complete Teleproduction Center
Under One Roof
STUDIOS * VIDEO * RENTAL * MOBILE

The letterhead shows one Broward phone number, one fax line and one toll-free number shared by all the companies. As Wanda Rayle characterized it in her testimony: "It was all one company." She added that all the business operations were handled as one company: payroll accounts and payments were handled together; insurance was handled as if there was only one company with a master account; an employee might be hired for one company but be sent to another as the need arose.

8. In late December 1985, after meeting Tolin and Ron Fenster at an industry function, Stockett applied for a job at Limelite through a 13–week intern program sponsored by the State of Florida. Stockett's Employer Setup Information Sheet from her Limelite personnel file reflects that she began employment on December 30, 1985 and that the company for which she would work was "LVP," a designation that Defendants' interrogatory answers reflect stood for "Limelite Video Partnership." As noted, Plaintiff worked first for several days as a receptionist for Limelite Studios, and began her internship on January 6, 1986. "Payroll Handcheck" forms bear notations indicating that during this period

Stockett also was paid by Studio and Video. Although Stockett thought she worked for DPC during this period, computer printouts filed with Defendants' UCT–6 (unemployment compensation tax) forms show that during this period, Stockett was paid by Limelite Studios for two weeks and by Video (which claimed "Limelite Video Partnership's" employees) for twelve weeks. During the second quarter of 1986, Stockett was paid for at least 4 weeks by Video and at least 4 weeks by DPC, but employment records are incomplete. Thereafter until the end of her employment, Stockett was paid by Video. Throughout her employment, there were times when Stockett worked for Limelite Studios or DPC or Video but was paid by another company.

9. Based on the "date hired" and "date term" shown on the 1986 and 1987 employee master lists, during 1986, Limelite Studios had 9 employees who worked twenty or more weeks, Video had 11 and DPC had 3; during 1987, Video had 19 employees who worked 20 or more weeks. During 1986, the Limelite companies (also including Limelite Mobile, Inc., Limelite Equipment Rental, Inc. and Limelite Motion Pictures, Inc.), had close to 50 employees altogether. At least 33 of these worked 20 or more weeks. Defendants have conceded that Limelite Video is an "employer" within the meaning of Title VII.

10. Stockett's involvement with Tolin and Limelite began at a Florida Film Producers Association awards affair at the Grand Bay Hotel in Coconut Grove, which she had attended with a girlfriend hoping to make some contacts that would help her either further a modelling career or break into the production industry. At the party, Plaintiff was introduced to Toby Ross, who was involved in an on-the-job internship training program sponsored by Florida State University, and to Ron Fenster and Tolin.

11. Stockett testified that she talked about the intern program with Fenster and Tolin. She was told that Dr. Ungarait from Florida State would be conducting interviews at Limelite in the near future; and she was invited to apply. Stockett

testified that she left soon thereafter and went home alone. This Court found Plaintiff to be a credible witness and we specifically credit her account as to this first meeting. While Tolin claims to have had a physical encounter with the Plaintiff that night, we do not credit that account.

12. Soon thereafter, Stockett went to the Limelite complex where Fenster introduced her to Dr. Ungarait. After an interview the Plaintiff was told that she was accepted into the program, which started January 6, 1986. Before she left, Fenster offered her a job as a receptionist for a few days before the internship program formally began. Stockett accepted.

13. A substantial number of Limelite employees were young women seeking careers in the entertainment industry. Limelite Studios rented out sound stages for use in movies and for commercials. A modelling agency in which Tolin had an interest had offices on the premises. Casting calls were routinely held at Limelite, bringing in actresses and models.

14. According to the testimony of the Plaintiff Stockett, Tolin made blatantly sexual advances to her virtually from her first day at Limelite until her last. Based on our review of all the testimony adduced at the trial this Court has credited Ms. Stockett's account that the Defendant Tolin sexually harassed her repeatedly, both verbally and physically, throughout her term of employment.

15. Tolin first approached Stockett in an offensive manner late in December 1985 while she was working as a receptionist during the filming of a Pepsi commercial. The Defendant came up to her at the receptionist's desk, put his arms around her from behind, pressed his body up against her and said "I'd love to eat you all up." Stockett pushed him away and asked Tolin to stop. Stockett was confused by Tolin's conduct but not totally surprised; Amparito Vargas–Lothian, another employee, had warned Stockett when she first started working at Limelite to stay away from Tolin because "he liked young girls."

16. On two occasions in 1986 within a month of each other, in the offices of Limelite Video, Tolin confined Stockett for a few seconds in her secretarial chair, where she was sitting and typing. Coming up behind her he pressed down on her shoulders so she couldn't get up, and then reached over and squeezed her breasts.

17. In January or February 1987, Stockett was changing clothes in the ladies room after work, getting ready to go to a circus. Tolin walked into the ladies bathroom and looked around a partition, smiled and said, "Hello." She screamed for him to leave. He stood there another few seconds and left. Tolin admits encountering Stockett in the ladies room, although he claims he just stuck his head in while turning off a light, saw she was there, apologized and left.

18. On another occasion, sometime in March or April 1987, after that bathroom incident, while Stockett worked at her desk, Tolin came up behind her, stuck his tongue in her ear and told her in the crudest terms that he wanted to perform oral sex on her. Stockett testified further that in 1988, the Defendant again approached her from behind, while she was working at her desk, stuck his tongue in her ear, and said with a four letter expletive that he wanted to have sexual intercourse with Plaintiff. On still other occasions, Stockett testified that while she was working, the Defendant would corner her, run his fingers up the front of her shirt, grab her breasts and pinch her nipples. During these assaults, he laughed and said, "You like that, don't you." Tolin also grabbed Plaintiff's buttocks whenever he could get close enough, as the Plaintiff walked down the hall. Stockett testified that incidents such as these occurred weekly throughout Stockett's employment. She further testified that Tolin's behavior was deeply offensive to her, altogether unsolicited, and that she regularly told the Defendant to leave her alone.

19. A few weeks before Stockett left Limelite in April 1987, Tolin's conduct became even more blatant. One night while Stockett was working late, about 6:30 or 7:00 p.m., she encountered Tolin. She thought no one else was in the building. Tolin pushed her up against the wall and

began licking her neck. According to Plaintiff, Tolin said he "wanted to f— me." Tolin had his hands on Plaintiff's shoulders, his body was pressed against hers and he was "right in her face." Stockett testified that she was terrified; she couldn't think and she couldn't move. Stockett testified that a former co-worker at Video who had taken space in the complex for his own business, walked by and did nothing. Moments later, Marie Arnold, who with Tolin owned Coty International, a modelling and talent agency with offices at Limelite, walked by, noticed the look on Plaintiff's face and interrupted Defendant's embrace. Arnold's testimony, in large measure, corroborates Plaintiff's account. According to Arnold, Stockett had tears in her eyes and from the look in Stockett's eyes and on her face, it was apparent that Stockett was afraid.

20. Finally, on a Wednesday, Thursday or Friday of the week before Stockett left Limelite in April 1987, as Stockett was leaving her office, she encountered Tolin in a hallway. Tolin told Stockett he was going away and asked how long she had been working there. When she replied that she had worked there for about one and one-half years, Tolin said to her, "you've always got an excuse, I want to f— you." He added that he was tired of waiting. Stockett told Tolin that she worked hard at her job and asked him to leave her alone. Tolin responded with a torrent of sexually explicit comments that included, "Oh, you work hard. Do you f— hard?" Tolin bragged about his sexual prowess, compared himself to a twenty year old, and, finally, demanded, "F— me or you're fired." Later that day, Stockett encountered Tolin again as he left for his trip. Tolin's parting words were, "I'll see you when I get back," a comment Plaintiff took as a direct threat. Stockett reported this incident to Marie Arnold, who, in turn, reported it to Wanda Rayle.

21. Stockett began thinking about leaving her job at the time of the incident Marie Arnold witnessed. It was not until Tolin directly threatened her and presented her with an ultimatum, however, that she decided she could no longer work at Limelite.

The following Monday, on April 20, 1987, Stockett gave two weeks' notice to Fenster and Michael Garrett that she was quitting, but stayed only a few extra days. Tolin was out of town and Stockett did not want to be there when he returned. She did not work the final two weeks in part because of Tolin's return date and in part because soon after she announced her resignation, Michael Garrett took away her desk and put her at a little schoolboy desk in the corner with no computer, no typewriter and no telephone.

22. The Court is satisfied from the full record that Plaintiff did not in any way encourage Tolin's verbal and physical advances. Repeatedly she pushed him away and told him to stop. She avoided Tolin by going in the opposite direction when she saw him. When she went into his office, she would tell another woman not to let the door be closed. She tried never to be alone with the Defendant.

23. Moreover, the evidence extant strongly suggests that Stockett stayed as long as she did and put up with Tolin's conduct as long as she did because she needed the work and wanted to learn the business. The Plaintiff feared that she would be fired immediately and her opportunity in the industry would be destroyed, by a man whom she perceived as being rich and very powerful.

24. This Court credits Stockett's testimony that she did not see an EEOC poster posted anywhere on the Limelite premises.

25. Stockett's account of a pervasively hostile work environment marked by the Defendant's repeated and explicit sexual advances is corroborated by the testimony of many other female employees at the Defendant companies.

a. Lourdes Claveria, who worked as an administrative assistant for Limelite Studios between June 1986 and June 1987, testified that one time she saw the door to Stockett's office open and found Tolin sitting on Stockett's desk facing her. She could see Tolin's office door from her desk. She observed Tolin call Stockett into his office, watched Stockett hesitate by the

door and ask to leave the door open. Tolin closed the door and, after having been in the office for awhile, Stockett came out visibly shaken, either crying or about to cry. Stockett did not tell Claveria what had happened.

b. Wardrobe mistress and costume designer Beverly Saffire, whose business operated out of the Limelite complex, recalled Stockett, crying and upset, asking to come into Saffire's dressing room to hide from Tolin, who had been "harassing her again." This incident occurred during the filming of a movie "The Unholy" at the studios.

c. Amparito Vargas–Lothian, who at various times worked for Limelite Studios and for Coty International, between 1984 and 1986, as a receptionist and an administrative secretary, overheard Stockett telling Defendant to stop and seeking to get away from him.

d. Wanda Rayle, who held a senior position in the Defendant companies for many years, including the position of Executive Vice President, testified that she witnessed Defendant Tolin's sexual advances towards the Plaintiff. Specifically, Rayle observed that Plaintiff complained to her on several occasions about the Defendant's harassment. On one occasion, Rayle recalled observing the Defendant Tolin standing with his arms wrapped around the Plaintiff's breasts.

e. Chris Carrol, who worked for DPC during Stockett's internship, witnessed Tolin walking arm and arm with Stockett. Gloria Reese, who worked in accounting and testified by deposition, observed Tolin talking to Stockett and walking with his arm around her.

f. Kevin Layne, a producer with offices on the Limelite premises, testified that he had talked to Stockett regarding Tolin's asking her to dinner and being "flirtatious."

g. Toby Ross, a free-lance producer and director, and a member of Florida's Motion Picture and Television Advisory Council testified that Plaintiff had called him while she was still working as an intern with the Defendant companies and complained that Frank Tolin was sexually harassing her.

Plaintiff told Ross that she was sure about the nature of the harassment and that it was serious. Ross added that he made a series of inquiries about the allegations, and informed Wanda Rayle about the charges. Rayle told Ross that she would make an inquiry and speak to Tolin about it. Thereafter Rayle informed Ross that she had spoken to Tolin and that if it had happened, it would never happen again. Ross further testified that he told Rayle about similar complaints from two other employees. Ross said Rayle called him back about these complaints and indicated she had spoken with Tolin and "everything is taken care of."

26. Tolin's conduct towards other female employees within the Limelite complex and women who had business with Limelite Studios, Limelite Video and DPC created an atmosphere in which deeply offensive conduct and plainly sexual overtones were constant and pervasive. Stockett was aware during her employment of the following events, which occurred on the Limelite premises:

a. She was told by Beverly Saffire of an incident during which Tolin stood in for a male actor during a semi-nude audition for the part of the demon in the movie "The Unholy." Beverly and her husband, Michael Saffire, handled wardrobe for "The Unholy," a movie of which Tolin was the executive producer and that was shot largely within the studio. During the auditions for "The Unholy," a number of women auditioned for the part of the demon. Beverly Saffire, who dressed the women, described the costume, which consisted of a see-through cape and bikini panties, as "as close to nude as we could get." The part required the woman to walk to a kneeling monk, entice him, taking off the robe and exposing her breasts, and to reach out and touch his face. There was supposed to be no reciprocal contact. Because of the nature of the scene, the set was "closed" and all non-essential personnel were excluded. Notwithstanding the "closed set," Tolin came into the audition and said that he wanted to play the part of the monk, playing opposite the scantily dressed women.

Two women, actresses "Donnatella" and Nicole Fortier, auditioned with Tolin. During the audition with Fortier, Michael Saffire heard Tolin ask Fortier if she would like him to touch her on the inside of her thighs and on her breasts. Fortier started trembling and stepped back as Tolin reached out for her. Beverly Saffire, who had watched the auditions from a distance, said that when Fortier left the set, she looked frightened and was "wide-eyed and shaky." She told Beverly Saffire that Tolin had tried to put his hands on her and asked her if she would "fool around" with him.

b. Another account about Tolin's conduct on the set of "The Unholy" quickly made the rounds of the "grips" and "gaffers" and came to Stockett's attention. During a nude scene with Jill Carroll, the female lead, Tolin was said to have barged onto the set and had a confrontation with an employee, whom he fired when he was denied access. This appears to be a composite of two separate incidents, both of which occurred in September 1986, that were witnessed by Beverly Saffire.

(1) Actor Ben Cross and actress Jill Carroll were doing a scene that required Carroll to drop her gown to her waist and expose her breasts to Cross. The set was closed, with only a skeleton crew present. Suddenly, the action stopped and Saffire observed Cross talking to director Camillo Villa. Carroll walked over to where the two men were standing and all three turned toward a window that opened on to the closed set from an adjoining area. There, looking through the window at the closed set, was Tolin. Cross and Camillo took Carroll and walked through a door to the area from which Tolin had been watching. Saffire followed and saw Tolin, holding Carroll by the arm and trying to pull her down on his lap.

(2) Toward the end of the shoot, the demon scene for which Nicole Fortier previously had auditioned, was shot. Fortier was cast in the part of the demon. Again, the set was closed. Saffire witnessed a loud argument between Tolin and Doug Bruce, the first assistant director, about Tolin's being on the set. Bruce insisted that Tolin leave and Tolin refused, telling Bruce that it was his set, his money and his film. After a few moments, Tolin approached Fortier and said, "I understand that you don't want me here," to which Fortier responded, "I'm very nervous, I don't want anyone here." At that point, Tolin said, "Do you understand that I pay your salary?" and asked Fortier, whose husband was on the set, to go out with him that night. Fortier said no. Bruce asked Tolin to leave again. Tolin refused again. Tolin fired Bruce. Bruce and Cross both "quit" and everyone left the set.

c. Stockett heard of an incident during which Tolin spit Syfo water on Eileen Kleinberg, a woman who worked in the accounting department. Kleinberg specifically testified that while she was sitting in an office with her supervisor Steve Conner, at work at a computer, Tolin picked up a jar of soda, swallowed some of the liquid and then spit at her chest and reached over to try to wipe it off. When she pushed him away, Tolin began chasing her. Kleinberg stopped Tolin by shoving a chair against his shins. Kleinberg said Tolin insisted he was joking and tried to equate his behavior to "playing in a [swimming] pool." Kleinberg's male supervisor witnessed the incident but apparently thought it was funny. Kleinberg was afraid to take any action against Tolin. She did, however, report the incident to Wanda Rayle and Marie Arnold. Kleinberg further testified that she and other women who worked at the Defendant companies were warned about Tolin's behavior. On one occasion, Kleinberg testified that the Defendant chased her with a rolled up poster, poking Kleinberg on the buttocks, while holding the poster against his genitals. She testified that she ran away. On another occasion Kleinberg testified that Tolin grabbed her from behind, but she pushed him away. On still another occasion the Defendant made a vulgar reference to his penis.

d. Stockett was told by Marie Arnold that Arnold put locks on her doors so Tolin wouldn't barge in when she was doing interviews with her models.

e. Stockett saw Tolin grab Amparito Vargas–Lothian's leg.

f. During the filming of "The Unholy," the crew printed and passed out T-shirts bearing the acronym:

T olin
H andles
E ager

U nderage
N ymphets.
H e
O nly
L ikes
Y oungsters.

Stockett observed these being worn around the studio by employees of Tolin's various companies. Michael Saffire testified that the slogan about Tolin had been written by Ben Cross.

27. Stockett testified that she felt helpless and was disgusted by Tolin's advances. Although Tolin sometimes stopped bothering Stockett when she pushed him away, she couldn't stop him permanently. The advances affected Stockett's ability to do her job; she became very nervous and went out of her way to avoid Tolin. Stockett regularly cried at the office and during her drive home from work. Stockett testified that she no longer trusts men and is uneasy around them. Stockett has had several jobs since terminating her employment at Limelite, including as a cocktail waitress, as a receptionist with a production firm, some modelling jobs, and work as an "extra." Stockett now works as a manager of a cosmetic counter at Lord and Taylor. She testified that the reason she enjoys this job is that she doesn't have to work with any men. Additionally, Stockett's doctor told her that she was getting an ulcer, and for approximately one year, Stockett has been taking Tagamet for stomach symptoms that include nervousness, burning, and being sick to her stomach.

28. The fear of being caught alone with Tolin was so pervasive that women who worked at Limelite, including Stockett, had an informal "buddy system" in which they tried to watch out for each other. Judy Klein testified that the women tried to help each other by staying around. Amparito Vargas–Lothian testified that she, along with Stockett, Klein, Chris Carroll, Martha Carr and Marie Arnold watched out for each other. They used hand signals to indicate when the coast was clear and would cover one another when one woman had to go to the restroom.

29. Stockett not only was warned about Tolin, but she warned others. Betsy Rivera, who worked for Limelite Studios as a receptionist, billing clerk and assistant to Wanda Rayle, was warned by several women, including Stockett and Lourdes Claveria, that Tolin "came on to pretty young girls," that "some allowed it," that he had a "short temper" but that he would "be nice to you if you were nice to him." Eileen Kleinberg testified that she was told that Tolin made advances toward people and that she should be careful; and Melissa Yonkey, a make-up artist who worked on "The Unholy," was warned that Tolin "liked ladies." Amparito Vargas–Lothian testified that "any new girls, they would warn."

30. Substantial and credible evidence presented at trial established numerous additional incidents showing a pervasively hostile work environment at the Defendant companies. The testimony was too detailed and the accounts far too numerous and credible to accept the Defendant's suggestion that he was somehow the victim of a conspiracy created by a few disgruntled employees.

a. Judy Klein, who had been hired as a receptionist by Limelite Studios, testified that she observed another female employee crying because, as the account was related to her, the Defendant Tolin stood behind the employee and placed his hands under her dress. Ms. Carr, the employee, who worked at Limelite Studios between January 1985 and May 1986, testified that Tolin placed his hands down the top of her dress, having come up from behind, as she sat at her desk. Notably, Judy Klein told Wanda Rayle about the incident.

Klein further testified that Tolin had sexually harassed her on a number of occasions. One time late at night as she was locking the door, the Defendant came up to her, admired the shirt Klein wore, took $400 out of his wallet and offered it to her if she would allow Tolin to put his hands on her shirt. She rejected Tolin's advance, telling him that he was crazy. Klein added that she often had to avoid being touched by Tolin, who would try to grab her on the bottom. Ms. Klein also explained that the women in the office would try to avoid being left alone with the Defendant. She recounted that she asked a male employee, Joe Ybarra, to "protect" her from Tolin's advances. Finally, Klein testified that she "put up with Defendant's conduct" for almost the whole year she worked there, because Tolin owned the studio and signed her checks. Joe Ybarra, a bookkeeper, who had worked for the Defendant Tolin at his construction company and Limelite Studios and Limelite Video, testified that he witnessed Tolin grab Klein from the rear and heard Klein warn Tolin "never to do that again." He added that he helped Klein avoid these encounters by being present.

b. Eileen Kleinberg, a bookkeeper/accountant at Limelite Studios in 1986 testified at considerable length about sexual harassment on the job. On one occasion she related that the Defendant Tolin chased her down the hall with a rolled up poster held over his genitals, using it to poke Kleinberg on the buttocks. She added that on another occasion she was working alone in the office when the Defendant "grabbed her from behind," around the neck, and tried to kiss her. On still another occasion she testified that the Defendant said to her that she "should try his penis" sometime. Kleinberg added that she reported these incidents to Wanda Rayle and Marie Arnold.

c. Lourdes Claveria, an administrative assistant at Limelite Studios between June 1986 and June 1987, testified that she witnessed Tolin harass female employees on the job. She related that once Wanda Rayle buzzed her to come into Rayle's office, where Rayle was behind closed doors with the Defendant. Rayle's voice was shaking as she asked Claveria to bring her an invoice. Claveria testified that she saw Rayle backed up against the wall by the Defendant. Thereafter Tolin moved away and Claveria returned to her own office. Another time, Claveria related that she saw the Defendant Tolin sitting close to Dawn Darfuss, an auditor for "The Unholy," on her desk. Claveria added that Tolin sat on her desk too, and tried to get close to her, but she interrupted him. On still another occasion Claveria testified that Martha Carr came into her office crying because the "Defendant had tried to put his hands down her blouse."

d. Gloria Reese, who worked in Limelite Studio's accounting department for about a year said that it was well known among the employees that the Defendant was reputed to like young girls, and that the Defendant had patted her "on the rear" while she was at work.

e. Amparito Vargas–Lothian worked as a receptionist and performed secretarial functions for Limelite Studio and Coty International between 1984 and 1986. In that connection she had occasion to work with Wanda Rayle and Marie Arnold. On one occasion in the office she testified that she witnessed the Defendant Tolin pat Ms. Arnold on the buttocks. She further described seeing the Defendant Tolin with his pelvis pushed against Ms. Arnold, squeezing her buttocks. On another occasion she said that she heard Ms. Arnold tell Tolin "to stop," "to leave her alone," and "to go away." Ms. Vargas–Lothian further testified that she saw the Defendant Tolin in the same pose with an actress. She added that Tolin had harassed her directly. Once, she related, Tolin described her as being "his head woman," which she took to be a blatantly sexual reference. Another time, she testified, Defendant Tolin "stuck his tongue in my ear as I was working." She added that Tolin had "backed her against the wall." On still a third occasion, Ms. Vargas–Lothian testified that the Defendant slid his hand inside her skirt, touching her inner thigh. She slapped him across the face. The Defendant Tolin repeatedly

came into her office and made sexually offensive comments. Once she recalled Tolin saying: "Oh! Come on, come on baby! I know you want me baby!" She testified that she often struggled with Tolin, occasionally walked out on him, or threw him out the door. Finally, she testified that the ladies room at the office was well known as a particularly dangerous place to be. She said that once the Defendant came into the ladies room and said to her: "Grind me!" She added that the Defendant pushed her against the wall.

f. Marie Arnold received a number of complaints about the Defendant Tolin, too. New and young female employees were regularly warned to be careful of the Defendant.

g. Still other witnesses testified about the Defendant's conduct at the office. Matthew Hayden, a producer, indicated that the Defendant would chase women in the studio. He indicated that he discussed Tolin's "conduct" toward women with Wanda Rayle. He added that either he or Rayle would keep Tolin busy doing something away from the set so that women working on the studio set would not be harassed by Tolin.

h. Wanda Rayle testified at length about Tolin's sexual misconduct in the offices of the Defendant companies. She stated that she worked for him for a number of years, starting out first as a real estate broker for him, and becoming, thereafter, a principal officer in the Tolin enterprises. In time her relationship with the Defendant grew strained, she left his employ and subsequently sued the Defendant herself. She stated that she constantly received complaints from women that they had been sexually harassed by Tolin. These complaints were described as occurring "daily." She described the work environment at the Defendant companies as being "a flagrant, horrible atmosphere." The complaints came from employees, from women coming onto the premises for casting, talent review, or crew shootings.

She testified further that these complaints of sexual harassment, including those from Toby Ross, were presented to Tolin regularly. Tolin would either deny the incident or tell Rayle that the business belonged to him. Regarding the Ross complaints, the Defendant admitted to Rayle that he had harassed and molested certain women, but he said he would not do it on the building premises. Rayle testified that every female employee but two had complained about the Defendant's misconduct. Rayle further testified that she witnessed the Defendant sexually abuse, and harass a number of the employees, including the Plaintiff, Ms. Vargas and Judy Klein. On one occasion Rayle confronted Tolin with a news story in the *Miami Herald* where Tolin was quoted as referring to a "casting couch." Tolin instructed Rayle "to mind her own business," remarking that "he could do what he wanted." [1]

31. The Defendant Tolin himself admitted at trial to the following incidents:

---

1. The following additional evidence of a sexually hostile work atmosphere was elicited from Defendant's own witnesses:

a. Chris Carroll, now a producer who uses the Limelite facilities in her business, testified that Tolin slapped men on the back but put his arms around women. While she testified that she did not observe a sexually hostile atmosphere, she indicated that women had in fact complained to her about the Defendant's conduct, including Marie Arnold's daughter, Ms. Vargas and Ms. Kleinberg. She added that she brought to the attention of Mr. Fenster an incident involving Ms. Carr.

b. Sherry Lleo, who has a modelling agency for teenage models and has both social and business contacts with Tolin, testified that Tolin "flirts" with attractive women and has "flirted" with her. She also testified that when she refused him, he stopped. Lleo testified that Tolin has tried to kiss her on the cheek or lips in a way that was "inappropriate in public."

c. Donna Stone, a former Limelite intern whose father had known Tolin for 25 years and was a tenant of Tolin's, testified that Tolin liked pretty women. She testified that she never saw the Defendant harassing any women, but added that "their whole atmosphere [at the company] was not as professional as it could be," "that odd things were going on," and that the place "was just a little weird."

d. Barbara Gouwens, Stockett's former roommate, and against whom Stockett recovered a judgment in a landlord-tenant dispute, testified that while Tolin never harassed her sexually in the work place, Defendant once leaned too close to her, generating a feeling of familiarity which she did not like.

a. That he offered Judy Klein, who worked for Studios as a receptionist and as a clerical worker in accounting, $400 to put his hand down her shirt and touch her breasts. Tolin excused this conduct as a "joke."

b. That he spit "syfo" water at Eileen Kleinberg, explaining this incident by saying that he had "gagged" on the liquid. He denied, however, touching Ms. Klein. This Court has found his explanation to be unbelievable.

c. That he got so sexually excited while telling a dirty joke to Martha Carr, he was compelled to reach over and touch her breasts. As he put it: "Something came over me at that particular moment." Tolin explained that Ms. Carr was unhappy with this, and that he never did it again.

d. That he claimed to have had an ongoing affair with Wanda Rayle, an employee. Tolin justified his actions on the grounds that the affair was "discrete" and that he was "in love."

e. That he told female employees dirty jokes. Tolin explained that he always asked first and that no one ever refused.

f. That he encountered Stockett in the ladies room on at least one occasion, although as pointed out above, Tolin's version of what happened differs from Stockett's.

g. That he gave Chris Carroll and Iris Cuisine, women in his employ, neck rubs.

h. That he told starlets that he owned the studios.

i. That he "stood in" for the male actor during the auditions for the part of the demon in "The Unholy."

j. That he tried to get into a closed set on the Limelite premises when Nicole Fortier was doing a nude scene.

k. That he received a "The Unholy" T-shirt.

l. That he made the comments that had appeared in Fred Tasker's column in the Miami Herald about the stereotypical "casting couch" being built into the trailers he manufactured.

m. In addition to admitting during trial to the incidents catalogued earlier in this order, Tolin acknowledged during his deposition testimony that he had been advised by Wanda Rayle that a woman had complained to Rayle about something he had said to her. He admitted that Rayle told him to stop bothering women because it was ruining the studio's reputation. He acknowledged that he had "heard" that Kleinberg was going to file a sexual harassment complaint against him. Chris Carroll spoke to Tolin both about Kleinberg and Carr.

32. Stockett presented expert testimony by a clinical psychologist, Glenn R. Caddy, PH.D., regarding both the psychological effects of her experience at Limelite and why she tolerated Tolin's advances. In addition to his other credentials, Caddy had treated numerous women who were the victims of sexual harassment. He saw Stockett beginning in June 1989 for evaluation in connection with this case. He testified that he spent 12 to 13 hours with Stockett and has administered formal tests including a "before and after" MMPI (Minnesota Multiphasic Personality Inventory) and sentence completion tests.

33. Caddy testified that sexual harassment is an example of a process known as victimization that ranges from the consequences of rape to family violence to spouse abuse to sexist slurs and low grade mistreatment of others. In less violent, more chronic situations, such as those that he opined occurred in this case, a person slowly evolves a sense of helplessness in coping with the situation. This results in anxiety, depression, feelings of personal incompetence, loss of a sense of self confidence and worth, and the inability to develop strategies for handling the treatment.

34. Caddy testified, and the Court finds his testimony consistent with the evidence presented, that Stockett suffered severe emotional distress as a result of the harassment by Tolin. The following impressions and opinions by Dr. Caddy are particularly salient:

a. As a result of Tolin's conduct, Stockett suffered from sleep disturbances, de-

pression and loss of energy, general anxiety, a sense of uncertainty, and anger. Caddy's diagnosis was a depressive neurosis.

b.  Stockett's distress while at Limelite was severe enough that Caddy would have recommended treatment to manage it; during cross examination he characterized it as "extreme." According to Caddy, Stockett saw Tolin as an increasingly vile person, and the problem for her became that she allowed herself to stay so long in that circumstance; the longer it went on, the more degraded and helpless she felt. Stockett felt she wasn't safe anywhere, even in the bathroom.

35.  The evidence presented suggests that the Plaintiff is suffering continuing damage, particularly in her inability to trust men and in her overall sense of personal confidence.  Dr. Cady testified that the Plaintiff would require psychotherapy for six months to a year at a projected cost of $7,500.

36.  Stockett's remaining life expectancy is 50.4 years.

37.  Tolin's net worth is said to be at least $25 million, the figure testified to by Ms. Chie Hoban, an accountant who kept the banking and financial records for Tolin and his companies.  The net worth figure offered by Tolin on a financial statement given a few days before the trial to a lending institution in connection with obtaining a line of credit was $82 million. His real estate is estimated to generate about $130,000 per month.  Tolin spent approximately $20 million on equipment and conversion of the facilities where the Limelite businesses are housed, an investment concerning which he told the Miami Herald, "I'm still a very wealthy man.  $20 million is a small fraction of my wealth." He testified at trial that he made this comment only to impress competitors.

38.  Video recently opened facilities in Los Angeles and New York.  An offering circular prepared in early 1989 in connection with solicitations for a private placement of stock showed a net income for the first seven months of 1989 of $278,000 and a projected net profit before depreciation of $1 million for 1990.  The book value of Video is said to be some $5.3 million.  The book value of Studios is approximated at $200,000.

## II.  CONCLUSIONS OF LAW

39.  This Court has subject-matter jurisdiction over the action, pursuant to 42 U.S.C.  § 2000e–5(f)(3) and 28 U.S.C. § 1331.

40.  Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, provides in pertinent part:

> (a) It shall be an unlawful employment practice for an employer—
>
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

42 U.S.C. § 2000e–2.

■ 41.  A plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.  *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).

■ 42.  For sexual harassment to be actionable under Title VII, however, the harassing actor must be an "employer," as defined by 42 U.S.C. § 2000e(b), i.e., an individual or a firm that is "engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person...." *Id.*  Defendants here concede, as they must, that "Limelite Video is an 'employer' within the meaning of Title VII." *See* Def. Proposed Findings of Fact & Conclusions of Law, at ¶ 6.  Defendant corporations argue, however, that the jurisdictional requirements are not satisfied as to the remaining two corporate Defendants.  We disagree, since we find that the Defendant corporations were sufficiently integrated

so as to be considered one "employer" for purposes of Title VII.

■ 43. A grouping of employers may be considered as one "employer" if they are highly integrated with respect to ownership and operations. *See Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir.1983) (parent and subsidiary constituted single "employer"); *Baker v. Stuart Broadcasting Co.*, 560 F.2d 389 (8th Cir.1977) (commonly owned and managed radio station and management company constituted single "employer"). Courts considering whether nominally separate entities should be treated as an integrated enterprise for the purposes of Title VII generally have employed the standards promulgated by the National Labor Relations board:

  a. The degree of interrelation between the operations,
  b. The degree to which the entities share common management,
  c. The centralized control of labor relations, and
  d. The degree of common ownership or financial control over the entities.

*Armbruster*, 711 F.2d at 1337; *Stuart Broadcasting*, 560 F.2d at 392.

44. In the instant case, there is strong evidence of interrelations of operations recognized by other courts as supporting the applicability of the integrated enterprise theory, including: sharing management services, such as check writing, sharing payroll and insurance programs, and the preparation of mutual policy manuals, *Stuart Broadcasting*, 560 F.2d at 392; *EEOC v. Financial Assurance, Inc.*, 624 F.Supp. 686 (W.D.Mo.1985); sharing services of managers and personnel, *id.;* using employees on the payroll of one entity to perform work for the benefit of another nominally separate entity, *EEOC v. Wooster Brush Co.*, 523 F.Supp. 1256, 1262 (N.D.Ohio 1981), *aff'd in part, rev'd in part on other grounds*, 727 F.2d 566 (6th Cir.1984); sharing use of office space, equipment and storage, *Financial Assurance, Inc.*, 624 F.Supp. at 688; *Wooster Brush Co.*, 523 F.Supp. at 1262; and providing services principally for the benefit of another entity or operating the entities as a single unit. *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 230 (4th Cir. 1975) (in view of unified operations of a manufacturer of men's clothing at another firm, which performed packing, shipping and clerical functions, the two corporations were a single employer for purposes of statutory coverage).

Likewise, that the same persons—Tolin, Rayle and Fenster—essentially managed and supervised the different entities, and that the companies had common officers and boards of directors, is evidence of the kind of common management that supports the second prong of the interrelated test.

45. The third prong required for the application of the integrated enterprise theory, the centralized control of labor relations, may be satisfied where, as here, there is a centralized source of authority for personnel. *See Financial Assurance, Inc., supra; see also Williams v. New Orleans Steamship Assoc.*, 341 F.Supp. 613, 616 (E.D.La.1972) (where an association controlled employment on waterfront, established uniform employment policies and practices applicable to all members and operated a central hiring hall from which members hired employees, members and association were treated as a single employer). A finding of centralized control of labor relations may be based upon evidence, as in the case at bar, that a single entity maintained personnel records for all of the companies, that a personnel department was shared, that personnel were transferred and promoted from one company to another, and that the same persons made employment decisions for all entities. *See McLean Trucking*, 520 F.2d at 230; *Ratcliffe v. Insurance Co. of North America*, 482 F.Supp. 759, 765 (E.D.Pa.1980).

46. The final factor to be considered in assessing applicability of the interrelated enterprise theory is the degree of common ownership or financial control over the entities. In this case, the evidence on that point strongly supports the theory's application. Frank Tolin controls all the companies and serves as an officer and director with each of them. *See Stuart Broadcast-*

*ing,* 560 F.2d at 392; *McLean Trucking Co.,* 520 F.2d at 230.

47. Defendants, then, taken together, are so integrated and interrelated as to constitute a single employer with 15 employees under Title VII. Therefore, they fall within the Court's jurisdiction. At all events, we observe again that Limelite Video alone had 19 employees who worked 20 or more weeks during 1987, which is sufficient to satisfy Title VII's jurisdictional requirements as to Video itself.

48. "Courts recognize two forms of sexual harassment: quid pro quo sexual harassment and hostile work environment sexual harassment." *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir.1989) (citing *Vinson,* 477 U.S. at 65–66, 106 S.Ct. at 2404–05; *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982)). "Quid pro quo sexual harassment occurs when an employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands." *Id.* (citing *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404; *Henson,* 682 F.2d at 908; 29 C.F.R. § 1604.11(a)(1), (2) (1987)). Hostile environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Steele,* 867 F.2d at 1315 (citing *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405 (quoting 29 C.F.R. § 1604.11(a)(3) (1987)); *Henson,* 682 F.2d at 902). "[W]here sexual harassment is 'sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment,' [*Henson* ], 682 F.2d at 904, a Title VII claim is made out 'irrespective of whether the complainant suffers tangible job detriment.' *Id.* at 901." *Phillips v. Smalley Maintenance Services, Inc.,* 711 F.2d 1524, 1529 (11th Cir.1983).

49. In order to prove a hostile environment sexual harassment case, a plaintiff must demonstrate:

a. that she belongs to a protected group, i.e., that she is a woman;

b. that she was subject to unwelcome sexual harassment;

c. that the harassment complained of was based upon sex, i.e., that the actor did not similarly harass male employees; and

d. that the harassment involved affected a "term, condition or privilege" of employment.

*Henson v. City of Dundee,* 682 F.2d 897, 903–04 (11th Cir.1982). Unwelcomeness means that an employee did not solicit or invite the alleged behavior. *Id.* at 903.

50. Plaintiff also asserts a claim for constructive discharge. To prove constructive discharge, an employee must demonstrate that the working conditions were so intolerable that a reasonable person in her position would be compelled to resign. *Steele,* 867 F.2d at 1317; *Huddleston v. Roger Dean Chevrolet,* 845 F.2d 900, 905 (11th Cir.1988); *Wardwell v. School Board,* 786 F.2d 1554 (11th Cir. 1986); *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61, 65 (5th Cir. 1980); *Young v. Southwestern Savings & Loan Association,* 509 F.2d 140, 144 (5th Cir.1975). As articulated in *Lewis v. Federal Prison Industries, Inc.,* 786 F.2d 1537, 1542 n. 4 (11th Cir.1986):

The general rule is that if an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee. *Young v. Southwestern Savings & Loan Association,* 509 F.2d 140, 144 (5th Cir.1975).

Although it has been held that constructive discharge does not occur when the last act of harassment occurs some time prior to the employee's resignation, *see, e.g., Steele,* 867 F.2d at 1317 (no constructive discharge where general manager's harassment ended 12 days before the plaintiffs resigned; resignation was voluntary); *Benton v. Kroger,* 46 Fair Empl.Prac.Cas. (BNA) 1356, 1359 (S.D.Tex.1986) (no constructive discharge where the last incident of alleged harassment occurred one month before plaintiff resigned), in the instant case, To-

lin's threat to Stockett, "I'll see you when I return," combined with his blatant sexual ultimatum that the Plaintiff have sexual intercourse with him or be fired, created an ongoing act of sexual harassment that continued until, just prior to Tolin's return, Stockett quit.

■ 51. At the outset, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank, supra* (citation omitted). "[W]here sexual harassment is 'sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment,' [citation omitted], a Title VII claim is made out 'irrespective of whether the complainant suffers tangible job detriment.'" *Phillips,* 711 F.2d at 1529. The requirement that the sexual harassment be pervasive both permits and may require the introduction of evidence of Tolin's similar harassment of other women. In this case the allegations that Defendant had mistreated other women in the office were known to Plaintiff. A plaintiff may introduce the testimony of others who allege that they were also subject to discrimination by the defendant. *See Thompson v. McDonnell–Douglas Corp.,* 416 F.Supp. 972, 981 (E.D.Mo.1976), *aff'd,* 552 F.2d 220 (8th Cir.1977); *Pettit v. United States,* 488 F.2d 1026, 1033, 203 Ct.Cl. 207 (1973). *See also* Richey, J., *Manual on Employment Discrimination Law and Civil Rights Actions in the Federal Courts,* at A–34–35 (Fed.Jud.Cen. rev. ed. 1986). In *Vinson v. Taylor,* 753 F.2d 141, 146 (D.C.Cir.1985), *aff'd in part, remanded on other grounds, supra,* the Circuit Court considered a district court's refusal to allow the plaintiff to elicit from other women under the defendant's supervision during her tenure, testimony that the defendant harassed them too. Holding that the district court had erred in excluding such testimony, the Court observed:

> *Bundy [v. Jackson,* 641 F.2d 934 (D.C.Cir.1981) ] makes clear that evidence tending to show Taylor's harassment of other women working alongside Vinson is directly relevant to the question whether he created an environment violative of Title VII.[40] Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive.[41]

---

n. 40. Such evidence could be critical to a plaintiff's case, for a claim for harassment cannot be established without a showing of more than isolated indicia of a discriminatory environment. [Full citation to *Bundy* omitted].

n. 41. *Cf. EEOC Decision No. 71–909,* Fair Empl.Prac.Cas. (BNA) at 269–270 (maintenance of working environment in which racial insults against blacks are habitual also violation of white employees' statutory rights).

753 F.2d at 146. *See also Broderick v. Ruder,* 685 F.Supp. 1269 (D.D.C.1988) (evidence of hostile atmosphere included harassment of other women including incidents that occurred at an office party, at an "office retreat," and outside-the-office affairs that were common knowledge within the office); *Delgado v. Lehman,* 665 F.Supp. 460 (E.D.Va.1987) (defendant's abusive treatment of other subordinates, including treatment that began three years before plaintiff began the position, admitted to show that harassment was not "isolated or genuinely trivial").

■ 52. Defendant Tolin, individually and as a managing agent for the corporate defendants, blatantly and repeatedly harassed Plaintiff and many other women who worked for him. His conduct included both constant sexually explicit, degrading, and vulgar language and repeated acts of physical abuse. His offensive sexual behavior was relentless, and can only be characterized as crossing all bounds of common decency. According to Plaintiff, she tolerated Tolin's advances because she wanted to keep her job. Finally, toward the end of Plaintiff's tenure, Tolin spelled out for her the quid pro quo terms of her continued employment: "F— me or you're fired!" On this record, then, Plaintiff has plainly established quid pro quo sexual harassment, hostile environment sexual harassment, and that she was constructively discharged by the Defendant Tolin.

53. Stockett is accordingly entitled to back pay from the date of termination of her employment with Defendant corporations (4/22/87) up to the date of trial (2/20/90), *see Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1526 (11th Cir. 1991), totalling 147 weeks. Therefore, at her rate of $16,380/year base pay, Stockett is entitled to back pay in the amount of $46,305, less $4,401 that she earned from other employment,[2] for a total back pay award of $41,904.[3]

54. Additionally, because of the working conditions detailed at the Tolin studios, reinstatement would be ineffective as a make-whole remedy, and Stockett is entitled to "front pay." *See Weaver,* 922 F.2d at 1528 ("[P]revailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay."); *Goldstein v. Manhattan Industries, Inc.,* 758 F.2d 1435, 1449 (11th Cir.) ("Front pay may be particularly appropriate in lieu of reinstatement where discord and antagonism would render reinstatement ineffective as make-whole remedy."), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985). Because of Stockett's testimony that she could not and would not return to the production industry in general, nor to the Tolin companies in particular, reinstatement would be a wholly ineffectual remedy. Front pay will therefore be awarded to make Plaintiff whole, but will be limited to one year, a reasonable time in which Plaintiff could have obtained comparable employment. *See Weaver,* 922 F.2d at 1529 ("A monetary award of front pay is calculated to terminate on the date a victim of a discrimination attains an opportunity to move to his 'rightful place.' "). Plaintiff is accordingly awarded $16,380 in front pay.

55. Inasmuch as Tolin was managing agent and principal of each of the corporations, and since the evidence of a pervasively hostile work environment was well known to the principal officers, agents, and employees of the Defendant companies, each of the corporations fairly is responsible for any sexual harassment by Tolin. *Henson,* 682 F.2d at 903–905.

56. As an individual defendant, Tolin, as an agent for a corporate employer, is directly liable for his actions that violate Title VII. *Id.*

57. Defendants assert that Stockett's Title VII claim is time-barred. We disagree. The Court credits Stockett's testimony that the final actionable encounter with Tolin took place on the "Wednesday, Thursday or Friday" before April 20, 1987, and, thus, was within the 300–day period prior to the filing of her complaint with EEOC. Furthermore, this is not a situation where the last act of discrimination occurred beyond the 300–day limit and only its effect continued into the statutory period. *See Hansel v. Public Service Co. of Colorado,* 778 F.Supp. 1126, 1134 (D.Colo. 1991) (continuing violation satisfies filing requirements of Title VII); *cf. United Airlines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) (nondiscriminatory seniority system gave present effect to past acts of discrimination but past acts themselves just unfortunate acts in history with no legal consequences). Tolin's ultimatum and promise that "I'll see you when I return" constitutes an act of harassment that was ongoing at the time of Plaintiff's resignation, not complete on the day Tolin left town. We therefore reject Defendant's argument in this regard, and accordingly grant the Title VII relief

---

**2.** Stockett testified that she earned $7 per hour for a 37 1/2–hour week, plus 1% commission, while working at Burdines "for a couple of months" during early 1989. Defendant did not elicit any testimony regarding the amount of her commission. The figure is based on a gross salary of $263 per week for 8 weeks.

**3.** Plaintiff also seeks overtime at 10 hours a week × $7.88 per hour × 1.5 × 50 weeks per year, for a total of $5,910.00. However, the evidence on this issue, principally Plaintiff's testimony, was not entirely clear. For example, Plaintiff testified that she worked overtime on a number of occasions yet was not able, in the main, to provide the Court with even approximate dates, except for her recollection that she had worked overtime every day for five specified weeks. Plaintiff, however, proffered no records or other evidence indicating that she had in fact worked overtime. Accordingly, the Court is constrained to deny Plaintiff's request for an award of overtime pay.

requested, in the amount of $58,284, as follows: (a) back pay in the amount of $41,904, plus (b) front pay in the amount of $16,380.

58. Plaintiff also asserts several claims for common-law torts, namely battery, invasion of privacy, intentional infliction of emotional distress, and false imprisonment. In addition to having federal question jurisdiction over plaintiff's claims under Title VII, this Court has pendent jurisdiction over the subject matter of the state tort claims arising between the parties. On the ample record presented, Plaintiff is entitled to prevail on her state-law claims.

59. To prevail on battery under Florida law, Plaintiff must prove that Tolin intentionally touched her in an offensive manner against her will. *See, e.g.,* Florida Standard Criminal Jury Instruction re: Sec. 784.03, Florida Statutes (1987). Florida recognizes "intrusion upon the plaintiff's physical solitude" as an actionable tort, under the general heading of "invasion of privacy." *Guin v. City of Riviera Beach,* 388 So.2d 604, 606 (Fla. 4th DCA 1980).

Florida also recognizes the tort of intentional infliction of emotional distress. *Metropolitan Life Insurance Co. v. McCarson,* 467 So.2d 277, 278–279 (Fla.1985) (resolving a conflict among the intermediate appellate courts and adopting the definition found at Section 46 of the Restatement). Whether the conduct alleged rises to the level proscribed is a question of law, not of fact. *See Ponton v. Scarfone,* 468 So.2d 1009, 1111 (Fla. 2d DCA), *rev. denied,* 478 So.2d 54 (Fla.1985).[4]

60. Under Florida law, the tort of false imprisonment is defined as "the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and deprivation of his liberty." *Harris v. Lewis State Bank,* 436 So.2d 338, 341 (Fla. 1st DCA 1983). Against these standards, we evaluate Plaintiff's state-law claims.

61. We find that Stockett is entitled to recover for the tortious behavior of Tolin. Tolin's groping and kissing of Stockett constituted both an offensive and

---

**4.** It is instructive to review what other courts have found when considering motions to dismiss within the context of the conduct alleged: courts considering emotional-distress counts similar to the one at bar consistently have held that the allegations sufficient to state a claim for sexual harassment are sufficient to state a claim for emotional distress, and have generally found what one court called "a common thread—a continued course of sexual advances, followed by refusals and ultimately, retaliation." *Shaffer v. National Can Corp.,* 565 F.Supp. 909, 915 (E.D.Pa.1983). As phrased in *Fawcett v. IDS Financial Services,* 41 FEP Cases 589, 593, 1986 WL 9877 (W.D.Pa.1986), which involved sexual propositions and the touching of a female employee:

> Other district courts have held that cases in which a supervisor has conducted a continued course of sexual advances and harassment, followed by refusals by the employee, and retaliation by the supervisor in the form of denying promotions or making the atmosphere of the work place oppressive, involved conduct that is sufficiently outrageous to state a cause of action for intentional infliction of emotional distress.

*See also Lucas v. Brown & Root, Inc.,* 736 F.2d 1202 (8th Cir.1984) (allegations that foreman conditioned continued employment on sexual relations held sufficient to state claim under Arkansas law for intentional infliction of emotional distress); *Vegh v. General Electric,* 34 FEP Cases 135, 1983 WL 30343 (E.D.Pa.1983) (allegations of unwelcome sexual "verbal and physical conduct" sufficient to state a pendent claim for emotional distress); *Stewart v. Thomas,* 538 F.Supp. 891 (D.D.C.1982) (sufficiently outrageous conduct alleged in complaint that the defendant touched the plaintiff in a sexual manner, caressed her body, attempted to kiss her and verbally pressured her for sexual relations, and then created a hostile work environment); *Rogers v. Loews L'Enfant Plaza Hotel,* 526 F.Supp. 523 (D.D.C.1981) (refusing to dismiss claims alleging invasion of privacy, assault and battery and intentional infliction of emotional distress by an assistant restaurant manager who had been subjected over a period of two months to insulting and demeaning remarks, abusive language and sexually-motivated advances from restaurant manager). Also relevant to the determination is the persistence with which the Defendant, Tolin, conducted himself. As the court observed in *Cummings v. Walsh Construction Co.,* 561 F.Supp. 872 (S.D.Ga.1983), in denying a motion for summary judgment on an emotional-distress count:

> While it is true that Professor Prosser states that a solicitation for sex to an unwilling woman has been held not to lead to liability, [Prosser], at 55, he states, at page 56, that prolonged or repeated invitation, when raised to the point of "hounding" the invitee, can lead to liability.

561 F.Supp. at 882.

unwelcome touching (i.e. battery) and an invasion of her physical solitude (invasion of privacy). Tolin's battery of Plaintiff—the repeated and offensive touching of the most private parts of Plaintiff's body—constitutes an intrusion into her physical solitude. Similarly, the act of entering the ladies bathroom constitutes an invasion of her privacy. In addition, the act of pinning Plaintiff against the wall and refusing to allow her to escape, even though only done for a short period of time, was false imprisonment. Further, the evidence establishes repeated physical attacks, as well as repeated verbal licentiousness. Tolin's conduct toward Stockett can only be characterized as being wanton, willful, and in total disregard of her rights. An ordinary prudent person, viewing his cumulative behavior, would be compelled to find this to be outrageous. The sum total of Tolin's conduct therefore also constituted an intentional infliction of emotional distress.

█ 62. Under Florida law, Plaintiff is entitled to a sum that will reasonably compensate her for (1) any pain, suffering and mental anguish already suffered by her and proximately resulting from the defendant's conduct; and (2) any pain, suffering and mental anguish that she is reasonably certain to suffer in the future from the same cause. *See* Fla. Standard Jury Instruction 6.2(a) (In personal injury actions, damages are recoverable for "[a]ny bodily injuries sustained ... and any resulting pain and suffering, disability, mental anguish and loss of capacity for the enjoyment of life experienced in the past or to be experienced in the future. There is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any such award should be fair and just in light of the circumstances."); *see generally* 17 Fla.Jur.2d §§ 40–45 (court has wide discretion in awarding damages in personal injury actions, since "the elements that enter into a judgment may be so diverse that the law can in no manner properly assess them"). We conclude that, as to the state torts of battery, invasion of privacy, false imprisonment, and intentional infliction of emotional distress, Plaintiff is entitled to compensatory damages in the aggregate amount of $250,000. *Cf. Direct Transport Co. v. Rakaskas*, 167 So.2d 623, 627 (Fla. 3d DCA 1964) ("[T]here is an assumption that the aggregate verdict constitutes an award of each particular item of damage as contended by plaintiff...."), *cert. discharged*, 176 So.2d 68 (Fla.1965). That figure is based on the following:

a. Tolin's physical assaults on Stockett, grabbing her breasts and nipples, running his fingers up her shirt and grabbing her from behind when he was walking behind her, occurred weekly throughout her employment.

b. Tolin physically confined Stockett in her chair on at least two occasions during which he fondled her breasts and pinned her up against the wall with his body on at least one occasion.

c. Stockett suffered from severe emotional distress during the entire time she worked at Limelite because of the sexually hostile atmosphere and Tolin's advances toward her. She continues to suffer distress, a loss of self esteem, and other lingering effects of her experience, and she will continue to suffer such distress in the future. On this record, we are satisfied that these damages are not fanciful or fleeting in nature. Therefore, Stockett is entitled to compensation for past mental anguish and loss of capacity for enjoyment of life; for future psychological care; and for future mental anguish and loss of capacity for enjoyment of life.

63. Defendants assert that Plaintiff was somehow pre-existingly vulnerable to Defendant's conduct. That she might have displayed a greater sensitivity to what happened to her, or that she might have suffered more than some other person, even if true—and the evidence available does not support these assertions—would not warrant any reduction in her recovery. The Defendants must take the plaintiff as they find her. *See* 17 Fla.Jur.2d § 45 (citing *Atlantic Coast Line R. Co. v. Dees*, 48 So. 28 (Fla.1908)); *Hollie v. Radcliffe*, 200 So.2d 616, 618 (Fla. 1st DCA 1967); *see also Parrett v. City of Connersville, Ind.*, 737 F.2d 690 (7th Cir.1984), *cert. dismissed*,

469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985).

64. In addition to the Title VII and state-law claims, Plaintiff also asserts a claim for overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Pursuant to 29 U.S.C. § 207(a), any covered "employer" must pay his non-exempt employees who are engaged in interstate commerce time-and-a-half their "regular rate" for any time they work in excess of 40 hours a week.[5] On this record, however, Plaintiff has not demonstrated facts sufficiently detailed or clear to merit recovery under the FLSA; accordingly, Plaintiff is not entitled to compensation at time-and-a-half for the hours she claims to have worked in excess of 40 per week, since insufficient evidence was adduced on this issue. *See* note 3, *supra.* Absent clear proof on this matter, Stockett cannot recover under the FLSA.

65. Plaintiff is, however, entitled to recover punitive damages. Florida law governs the issue of punitive damages as to the state-law claims. *See Litman v. Massachusetts Mut. Life Ins. Co.*, 791 F.2d 855, 856 (11th Cir.1986), *vacated on other grounds*, 798 F.2d 1355 (11th Cir.1986), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 652 (1988); *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1526–31 (11th Cir.1985); *Cook v. Deltona Corp.*, 753 F.2d 1552, 1563 (11th Cir.1985). While a punitive damages award is a drastic and often disfavored remedy, under controlling Florida law the particularly extensive and egregious conduct evident here warrants such a remedy. *See generally* 17 Fla. Jur.2d §§ 109–11. Under Florida law, punitive damages may be awarded "as punishment and as a deterrent to others" if the defendant's conduct "showed such reckless indifference to the rights of others as to be equivalent to an intentional violation of those rights." *See In re Standard Jury Instructions*, 540 So.2d 825, 826 (Fla.1989)

(approving Florida Standard Jury Instruction 6.12). The primary factors we are directed to consider in ascertaining whether a punitive damage award may be properly assessed include: (1) the nature of the defendant's misconduct, (2) the pervasiveness, frequency and persistence of the misconduct, (3) the defendant's wealth, and (4) the need for and likelihood of deterrence. *See id.* Thus, the amount of punitive damages to be awarded, if any, is discretionary with the fact-finder, who is directed to consider "the nature, extent and degree of the misconduct and the related circumstances [including the financial resources of such defendant]." *Id.* (brackets in original). Further, under Florida law, we are instructed that the amount of an award of punitive damages need not be precisely proportioned to the actual or compensatory damages awarded. *Lassitter v. International Union of Operating Engineers*, 349 So.2d 622 (Fla.1976). Indeed, the Florida Supreme Court has held that a finding of liability alone will support punitive damages, and thus there is no need that the plaintiff suffer any financial loss for which compensatory damages would be appropriate. *Ault v. Lohr*, 538 So.2d 454, 456 (Fla.1989) (answering certified question posed in *Lohr v. Florida Dep't of Corrections*, 835 F.2d 1402 (11th Cir.1988)). This is said to be especially true with intentional torts such as assault and battery. *See Ault*, 538 So.2d at 457 (Ehrlich, J., concurring). The application of the rule set forth in *Lassitter*, and in *Ault*, is most apparent when "the conduct by a very affluent defendant is outrageous but the resultant injury or invasion of legal rights to the plaintiff is minimal, although the conduct has the propensity of causing great harm if continued." *Lassitter*, 349 So.2d at 626.

66. In considering the nature, extent, and enormity of the wrong and all of the surrounding circumstances, courts have regularly considered acts other than the

---

**5.** For an employee to be considered exempt as an executive or administrative employee under 29 U.S.C. § 213(a), and therefore not entitled to the protections of the FLSA, the employee must be *inter alia*, guaranteed a specific salary for each pay period. An employee who can be docked for missing a day of work cannot be considered an exempt employee, regardless of whether he meets the other qualifications for exemption. *See Retail Store Employees Union Local 400 v. Drug Fair–Community Drug Co., Inc.*, 307 F.Supp. 473 (D.D.C.1969).

acts giving rise to the defendant's liability to the plaintiff on the issue of punitive damages. In *Campbell v. Government Employees Ins. Co.*, 306 So.2d 525, 531 (Fla.1974), the Court noted the following examples of cases where punitive damages awards had been upheld: "Thalidomide tranquilizing drug cases where hundreds of children were deformed, cases of outrageous highhandedness, e.g., ... auto sales agency's fraudulent practice of setting back speedometers on cars, and others." *Campbell* recognized that the acts of defendants against third parties likewise are a proper consideration in awarding punitive damages. In suits for assault, evidence of prior assaults has been held admissible on the issue of exemplary damages. *See White v. Burger King Co.*, 433 So.2d 540, 541–42 (Fla. 4th DCA 1983).[6] Furthermore, under Florida law, a punitive damage award is particularly appropriate as to the tort claims asserted here:

> [P]unitive damages are recoverable in all actions for damages based on tortious acts which involve the ingredients of malice, moral turpitude, or wanton and outrageous disregard of the plaintiff's rights. For example, such damages may be allowed in actions for ... assault, assault and battery, false imprisonment, [and] invasion of privacy....

17 Fla.Jur.2d § 115 (citing *Florida East Coast R. Co. v. McRoberts*, 111 Fla. 278, 149 So. 631 (1933)) (footnotes omitted).

67. In addition, in determining the amount of punitive damages, the defendant's wealth is an important consideration. *Bankers Multiple Line Insurance Co. v. Farish*, 464 So.2d 530, 533 (Fla.1985). In this regard, the Florida Supreme Court has observed that "the more pecunious the defendant the greater must be the punitive damages assessed in order 'to get his attention' regardless of the amount of actual damages awarded the plaintiff." *Id.* And in *Rinaldi v. Aaron*, 314 So.2d 762, 764 (Fla.1975) (quoting Dobbs, *Remedies* at 218, 219), the Florida Supreme Court put the matter in these terms:

> [S]ince the purpose of punitive damages is punishment and deterrence, the sum assessed if it is to be effective at all, must be sufficiently large to have effect. A hundred dollar punitive liability may be sufficient punishment for a man of limited means, a thousand dollar liability might be inadequate for a man of great wealth.

68. Furthermore, deterrence of both the defendant and others is a primary aim in awarding exemplary damages. "Punitive damages apply to wrongdoing not covered by the criminal law, where the private injuries inflicted partake of public wrongs." *Arab Termite and Pest Control, Inc. v. Jenkins*, 409 So.2d 1039, 1042 (Fla.1982). Indeed, the Florida Supreme Court has said that punitive damages are "the most satisfactory way to correct evil-doing in areas not covered by criminal law." *Campbell*, 306 So.2d at 531. Florida courts have awarded punitive damages for the purpose of general deterrence—that is, to deter others regardless of whether a particular defendant's course of conduct has ceased—in order to achieve socially desirable results; and the Florida courts have found punitive damages to be efficacious to deter a defendant's particular misconduct. *See, e.g.,*

---

6. *See also, e.g., Murphy v. Waldrip*, 692 S.W.2d 584 (Tex.App.1985) (evidence of prior extraneous conduct by defendant admissible where punitive damage being sought for malicious tort); *Burleson v. Finley*, 581 S.W.2d 304 (Tex.Civ.App. 1979) (evidence that defendant had killed a neighbor relevant and material to issue of exemplary damages); *Jaques v. Ellis*, 219 S.W.2d 104 (Tex.Civ.App.1949) (evidence of defendants' prior conduct on the night of assault, including throwing themselves and their companions in a swimming pool and a fight during which they bloodied the nose of a third person admissible on the issue of exemplary damages); *Kurn v. Radencic*, 193 Okla. 126, 141 P.2d 580 (1943)

(evidence that employee had previously committed other unjustified, unnecessarily violent assaults on other trespassers admissible to establish evil intent because employer who knowingly retains a servant with a tendency to be brutal is *more guilty and thus entitled to greater punishment* than a person who exercises more caution in the selection and retention of servants) (emphasis added); *Anello v. Savignac*, 116 Wis.2d 246, 342 N.W.2d 440 (Ct.App.1983) (evidence of student's five earlier fights correctly admitted to prove malicious intent, which was relevant to plaintiff's claim for punitive damages).

*Celotex Corp. v. Pickett,* 490 So.2d 35, 38 (Fla.1986) (holding successor corporation that merged with predecessor corporation liable for punitive damages and noting that the "realization that these companies will sell for less, or not at all, if they engage in reckless behavior provides an incentive for acquisition candidates to conform their behavior to socially acceptable norms").

69. Regarding the nature of the particular claims asserted here—i.e. sexual harassment, assault, battery, etc.—the Florida Supreme Court has noted:

> There can be no doubt at this point in time that both the State of Florida and the Federal Government have committed themselves strongly to outlawing and eliminating sexual discrimination in the workplace, including the related evil of sexual harassment. The statutes, case law and administrative regulations condemn sexual harassment in the strongest possible terms.

*Byrd v. Richardson–Greenshields Securities, Inc.,* 552 So.2d 1099, 1102 (Fla.1989) (holding workers compensation not exclusive remedy for sexual harassment claims). Indeed, Florida's public policy against sexual harassment has been characterized as "overwhelming." *Id.* at 1103. In light of this policy, it is noteworthy that "punitive damages ... are awarded to the injured party as a reward for his public service in bringing the wrong doer to account." *Campbell,* 306 So.2d at 531 (citing *Neal v. Newburger Co.,* 154 Miss. 691, 700, 123 So. 861 (1929)).

70. Courts in Florida and elsewhere have awarded punitive damages in substantial amounts for willful and egregious misconduct similar in kind to that of the defendant. In many of these cases, the plaintiff was not the defendant's only victim. *See, e.g., Joan Greenberg v. Malcolm Cohen and Medex Services, Inc.,* No. 88–6639–Civ–Paine, and *Debra Rowland v. Malcolm Cohen and Medex Services, Inc.,* No. 88–6640–Civ–Paine (S.D.Fla.1989) (owner of ambulance service patted plaintiff secretaries on bottoms, asked them if they "gave good head" and invited them to cheat on their husbands and boyfriends by sleeping with him; $50,000 each in punitive damages on tort claims, no compensatory damages; back wages on Title VII claim in an amount to be determined); *Shrout v. The Black Clawson Co.,* 689 F.Supp. 774 (S.D.Ohio 1988) (company held liable for supervisor's hostile-environment and quid pro quo sexual harassment that continued for four years after female employee ended consensual affair with supervisor; $132,-000 awarded, of which $17,000 was back wages under Title VII, $75,000 was for intentional infliction of emotional distress, and $50,000 in punitive damages); *Priest v. Rotary,* 634 F.Supp. 571 (N.D.Cal.1986) (employer transferred waitress from high-tip cocktail lounge because she would not wear revealing clothes, repeatedly touched her and kissed her, exposed his genitals to her and another waitress, picked plaintiff up and carried her across room, gave better assignment to waitress with whom he was having sexual relations, and finally fired plaintiff waitress; $95,000 awarded for battery, wrongful imprisonment and intentional infliction of emotional distress; $12,563 awarded in lost wages, and $15,000 in punitive damages); *Seritis v. Lane,* 30 FEP Cases 423 (Alameda, Cal., County Sup. Ct.1980) (restaurant union official directed toward 18–year–old waitress behavior that the court described as a pattern of soliciting women union members for sex, urging them to engage in sex with third persons and offering them employment as prostitutes and pornography entertainers, and when she failed to comply, she received no jobs; $25,000 awarded for emotional distress; $100,000 in punitive damages, $50,-000 against union and official).

71. Under controlling Florida law, we conclude that Tolin's relentless pursuit of Plaintiff and others warrants special remediation by this Court. The Court will impose punitive damages in this case. In doing so, this Court is guided by the following:

a. The "overwhelming" public policy of the State of Florida is against sexual harassment.

b. Tolin evidenced extreme insensitivity to the inappropriateness of his behavior, its

effect on his victims and, for that matter, on the reputation of his studio and industry. The record has established that Tolin was warned repeatedly by many people including his senior personnel about complaints of sexual harassment. The willfulness of his conduct was exemplified by his continuous assertions that "the business belonged to him" and that he "could do what he wanted."

c. There is potential for great harm to be caused by Tolin's behavior, and similar behavior by others. We are mindful that many of the women who are involved in the production and film industries are young and inexperienced. And this Court cannot ignore the testimony of Dr. Caddy, which was unrebutted by defendants, that sexual harassment can have "significant psychological consequences" including anxiety, high grade depression, and a growing loss of self-worth.

d. Tolin made oppressive and invasive demands on Plaintiff and blatantly attempted to extort sex from her as a condition of employment.

e. The cost to Stockett of performing the role of a "private attorney general" is real. It is worth repeating that a sexual harassment plaintiff, more so than perhaps any litigant besides a rape victim, is herself on trial. No corner of Ms. Stockett's life or psyche was beyond the attempted reach of the Defendants' inquiry. She pursued this action knowing that the most embarrassing and intimate details of her life likely would be discussed in a public courtroom. If sexual harassment is to be eradicated—particularly the degrading and pervasive conduct well-documented on this record—the sacrifice called for in terms of the victim's privacy and dignity must be recognized and her service rewarded for bringing the wrongdoer to account. *See* Campbell, *306 So.2d at 531.*

f. The great wealth of Tolin, and his observation that $20 million dollars is but a small fraction of his wealth must also be considered. This boast, which Defendant contends was meant only to impress his competitors, will be a yardstick against which others will measure any punitive damage award. He is known, indeed self-proclaimed, to be fabulously wealthy. Under Florida law, if a punitive damage award against Tolin is to have either a special or general deterrent effect, it will have to be sufficiently large to be punitive at all.

g. We also consider the pervasiveness of the sexually hostile atmosphere and the frequency with which Tolin accosted Plaintiff and so many other women on the premises, and the thoroughly egregious, wanton nature of Tolin's conduct. Video, Studios, and DPC each knowingly allowed Tolin to carry on his activities as he served as principal officer and agent of each of them.

72. In short, notwithstanding this Court's general reluctance to award punitive damages, under controlling Florida law, the wanton, offensive, and continuous nature of the Defendant's misconduct clearly warrants an award of exemplary damages.

73. Furthermore, it is axiomatic that a corporation can act only through its agents. Thus, when the agent of a corporation who causes the harm is the managing agent or primary owner of the corporation, punitive damages may be assessed against the corporation for the acts of the managing agent. *Bankers Multiple Line Insurance Co. v. Farish*, 464 So.2d 530, 533 (Fla.1985); *Browning v. State*, 101 Fla. 1051, 133 So. 847, 848 (1931); *Puchner v. Drexel Burnham Lambert, Inc.*, 498 So.2d 550 (Fla. 3d DCA 1986).

Therefore, based on the evidence and arguments presented, it is

ORDERED AND ADJUDGED that Plaintiff, Michelle Ann Stockett, shall recover from the Defendants, Frank Tolin, Limelite Studios, Inc., Limelite Video, Inc. and Directors Production Company, jointly and severally, judgment for damages in the aggregate amount of $308,284, apportioned as follows:

1. As to Count I, for violation of Title VII, back pay in the amount of $41,904, plus front pay in the amount of $16,380.

2. As to the state torts of battery, invasion of privacy, false imprisonment and in-

tentional infliction of emotional distress, compensatory damages in the aggregate amount of $250,000. Additionally, it is

ORDERED AND ADJUDGED that Plaintiff shall have judgement for punitive damages in the amount of $1.00 against Directors Production Company, $5,000 against Limelite Studios, Inc., $50,000 against Limelite Video, Inc., and $1 million against Frank Tolin, for a total of $1,055,-001 in punitive damages. Plaintiff's total recovery in the case, as to both compensatory and punitive damages, shall therefore be $1,363,285. Finally, it is further

ORDERED AND ADJUDGED that Plaintiff, as a prevailing plaintiff in a Title VII action, is entitled to recover reasonable attorney's fees pursuant to 42 U.S.C. § 2000e–5(k). A proposed Order of Final Judgment shall be submitted by Plaintiff within fifteen (15) days of this Order.

DONE AND ORDERED.